[S.F. No. 22758. In Bank. Oct. 5, 1970.]

CITY OF SANTA CLARA, Petitioner, v.
DONALD R. VON RAESFELD, as City Manager, etc., Respondent.

242

**COUNSEL**

Wilson, Jones, Morton & Lynch and Robert G. Auwbrey for Petitioner.

Edwin J. Moore, City Attorney, and M. Van Smith, Assistant City Attorney, for Respondent.

OPINION

WRIGHT, C. J.—In this mandate proceeding, the City of Santa Clara seeks to compel respondent city manager to issue notices of sale for the sale and issuance of $6,800,000 of revenue bonds.

The facts are not controverted. Petitioner is a municipal corporation and a charter city of this state. Respondent is its city manager. On September 3, 1968, petitioner's city council adopted a resolution calling for a special election for the purpose of submitting to its qualified voters the following proposition: "Shall the City of Santa Clara issue revenue bonds in the principal amount of Six Million Eight Hundred Thousand Dollars ($6,800,000) for the acquiring, constructing and financing of improvements to an enterprise, consisting of the City sanitary sewerage works and system, and all costs incidental thereto?" The bonds would finance petitioner's share of the expansion and improvement of inter-municipal water pollution control facilities. The resolution specified that the rate of interest on the bonds was not to exceed 6 percent per annum, payable semiannually. The election was conducted pursuant to section 1321 of the city charter[1] and the Revenue Bond Law of 1941.[2] The proposition was passed on November 5, 1968.

Thereafter petitioner took all steps necessary for a public sale of the bonds. It alleges, however, that since the election the interest rates in the municipal bond market have increased to such an extent that the bonds cannot be sold as originally authorized.

On July 25, 1969, the Legislature enacted an urgency measure allowing the sale of certain previously authorized bonds at a maximum interest rate of 7 percent per annum without the necessity of further election.[3]

---

[1]Subsection (c) of section 1321 of the City Charter of Santa Clara provides: "The City Council may avail itself of any of the procedures now or hereafter authorized by the general laws of the State of California for the issuance of revenue bonds or the City Council may, by ordinance or resolution effective upon adoption set up and establish a procedure for the issuance of such revenue bonds, the calling and holding of elections therefor, and all matters pertaining to the issuance and sale of such bonds; provided, however, that the issuance of said revenue bonds shall be submitted to the electors at an election and the votes of a majority of all those voting on the proposition shall be required to authorize the issuance of the bonds."

[2]Government Code section 54300 et seq.

[3]Government Code section 53540.
"As used in this article:
"(a) 'Local agency' means county, city, city and county, public district, public entity or authority or other public or municipal corporation.
"(b) 'Legislative body' means the legislative body, as defined in Section 53000, of the local agency.
"(c) The term 'bonds' includes bonds, warrants, notes, or other evidences of

On January 13, 1970, petitioner's city council adopted a resolution ordering the sale of the previously authorized bonds with the maximum rate of interest increased to 7 percent. The new bonds were to be of equal lien and at co-parity with certain bonds issued in 1960 and were to be issued without another election pursuant to Government Code sections 53540 and 53541.

Thereafter petitioner directed respondent to issue and mail notices of sale calling for bids on the newly authorized bonds. Respondent refuses to issue the notices of sale on the following grounds: (1) that the sale and issuance of the bonds at a higher rate of interest must first be submitted to and approved by the qualified voters in accordance with the city charter; (2) that the previously conducted election created vested contract rights between the electorate and petitioner as to the interest rate of the bonds, and that the contract cannot be altered except by a new election; and (3) that to issue the newly authorized bonds at a maximum interest rate of 7 percent at co-parity and equality of lien with previously issued bonds without a new election would violate vested contract rights between petitioner and the outstanding bondholders.

### I. Issuance of bonds with increased maximum interest rates.

The resolution adopted by petitioner's city council authorizing the issuance of the sewer bonds with an increased maximum interest rate is founded, in part, on the provisions of Government Code sections 53540 and 53541. Section 53541 provides that "[a]ny provision of law requiring an election to the contrary notwithstanding," local governing agencies may issue bonds with a maximum annual interest rate of 7 percent if the prin-

---

indebtedness of a local agency, zone or improvement district except those which under Section 18 of Article XI or other provision of the Constitution of the State of California are required to be authorized at an election."
Government Code section 53541.
"Any provision of law requiring an election to the contrary notwithstanding, the legislative body without a vote of the electors may issue bonds of the local agency, zone or improvement district if:
"(a) The principal amount of such bonds does not exceed the then unissued balance of the principal amount of bonds of the same type authorized at an election heretofore held in the local agency, or in such zone or improvement district;
"(b) The bonds are issued for the same purpose as that for which said unissued bonds were authorized; and
"(c) The bonds are issued in accordance with the laws governing the issuance of bonds of the local agency, except for the requirement of a bond election.
"Bonds issued pursuant to this section may bear interest at a rate or rates not to exceed 7 percent per year. When bonds are issued pursuant to this section, unissued bonds as referred to in subdivisions (a) and (b) of this section in a principal amount at least equal to the principal amount of bonds issued pursuant to this section, shall be canceled by order of the legislative body and shall not be issued."

cipal amount of the bonds does not exceed the then unissued balance of the bonds of the same type previously authorized at an election, if the bonds are issued for the same purpose as those previously authorized, and if the bonds are issued in accordance with local regulations except for the requirement of a bond election.

Section 1321 of petitioner's city charter provides that the city council has the power to issue revenue bonds. The charter permits the city council to use any procedures authorized by the general laws of this state for the issuance of revenue bonds, or the council may establish its own procedures. In either case, however, the issuance of revenue bonds must be submitted to and approved by a majority vote of the electors.[4]

Respondent contends that the issuance of revenue bonds is a municipal affair and that the city charter requires a new election if the bonds are to be issued at an increased rate of interest. Petitioner contends that all the requirements of the city charter have been met. We need not determine, however, whether the provisions of the charter require an election, for we have concluded that the question is of statewide concern and therefore controlled by the applicable state law.

■ When it appears that a municipal regulation and a general state law are in conflict, the controlling law will depend on whether the subject matter is a municipal affair or whether it is of statewide concern. ■ If the matter is a municipal affair, local ordinances and regulations will be upheld despite conflict with the general state laws if the city charter includes appropriate "home rule" provisions.[5] (*Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 61 [81 Cal.Rptr. 465, 460 P.2d 137].) ■ "As to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless

---

[4]See footnote 1, *supra.*

[5]Until it was repealed on June 2, 1970, California Constitution, article XI, section 6, provided in part: "Cities and towns hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered, and cities and towns heretofore organized by authority of this Constitution may amend their charters in the manner authorized by this Constitution so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws."

Since June 2, 1970, California Constitution, article XI, section 5, subdivision (a) provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general law. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

Petitioner is a "home rule" charter city.

of the provisions of their charters, if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation (the preemption doctrine)." (*Bishop* v. *City of San Jose, supra,* at pp. 61-62.)

"Because the various sections of article XI fail to define municipal affairs, it becomes necessary for the courts to decide, under the facts of each case, whether the subject matter under discussion is of municipal or statewide concern. This question must be determined from the legislative purpose in each individual instance." (*Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 294 [32 Cal.Rptr. 830, 384 P.2d 158].)

Historically the treatment and disposal of city sewage is a municipal affair (*City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93, 99 [308 P.2d 1]; *Loop Lumber Co.* v. *Van Loben Sels* (1916) 173 Cal. 228, 232 [159 P. 600]; *Cramer* v. *City of San Diego* (1958) 164 Cal.App.2d 168, 171 [330 P.2d 235]), and bond issues to finance municipal sewer projects are therefore also municipal affairs. (*City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach* (1960) 54 Cal.2d 126, 137 [5 Cal.Rptr. 10, 352 P.2d 170]; *City of Grass Valley* v. *Walkinshaw* (1949) 34 Cal.2d 595, 599-601 [212 P.2d 894].) As in the case of other municipal projects, however, sewer projects may transcend the boundaries of one or several municipalities. Such projects also may affect matters which are acknowledged to be of statewide concern; e.g., protection of navigable waters (*Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 416-419 [62 Cal.Rptr. 401, 432 P.2d 3]), tidelands (*Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 209 [282 P.2d 481]), and the public health (see *Stanislaus Co. etc. Assn.* v. *Stanislaus* (1937) 8 Cal.2d 378, 383-384 [65 P.2d 1305]). In such circumstances the project "ceases to be a municipal affair and comes within the proper domain and regulation of the general laws of the state." (*Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 603, 611 [9 Cal.Rptr. 431].) As this court stated in *City of Pasadena* v. *Chamberlain* (1928) 204 Cal. 653, 659-660 [269 P. 630], "It may be admitted that, generally speaking, the distribution of water within municipalities would be as to each of such municipalities a municipal affair, but it would be entirely too narrow an interpretation of the purposes and scope of the Metropolitan Water District Act to hold that, because the distribution of water for domestic use in each of a number of the municipalities within a designated area is a municipal affair, the formation of a common purpose for the acquisition of water in large quantities from sources outside of such municipalities, and even outside of the area within which they exist, and the distribution of such water, when so acquired, among such cities, in accordance with a common plan, and with a view to achieving equitability in the distribution and use

of such water, would in any sense be, as to each or any of such combined municipalities, a municipal affair. The impossibility or impracticability of any one or more of such municipalities acting separately and independently in the acquisition and distribution of such water would seem to argue conclusively that in achieving such object by the means provided for in said act the municipalities engaged therein could not be held to be engaged in the conduct of a merely municipal affair." (See also *Pac. Tel. & Tel. Co.* v. *City & County of San Francisco* (1959) 51 Cal.2d 766, 774 [336 P.2d 514]; *Pixley* v. *Saunders* (1914) 168 Cal. 152, 160 [141 P. 815]; *Gadd* v. *McGuire* (1924) 69 Cal.App. 347, 354-355 [231 P. 754]; *Santa Barbara etc. Agency* v. *All Persons* (1957) 47 Cal.2d 699, 710 [306 P.2d 875], reversed on other grounds 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174].)

█ In the present case the revenue bonds are to be issued to finance petitioner's share of a regional water pollution control facility involving the efforts of several cities acting in common. The total cost will be approximately $30,000,000, and the facilities cannot be constructed without petitioner's participation in the payment of these costs. Furthermore, the sewage treatment facilities will protect not only the health and safety of petitioner's inhabitants, but the health of all inhabitants of the San Francisco Bay Area. Accordingly, the matter is not a municipal affair.

We turn now to whether petitioner has properly complied with the requirements of Government Code sections 53540 and 53541, authorizing the issuance of the bonds at a higher rate of interest without the necessity of further election. Respondent does not contend that the principal amount of the new bonds exceeds the balance of the heretofore unissued bonds previously authorized, nor that the bonds will be used for a purpose different than that of the previously authorized bonds, nor that except for the requirement of an election all the other requirements for the issuance of the bonds have not been complied with. Respondent argues, however, that the revenue bonds in issue do not come within the definition of bonds specified in section 53540. That section provides that the term "bonds" includes "bonds, warrants, notes, or other evidences of indebtedness of a local agency, zone or improvement district except those which under Section 18 of Article XI or other provision of the Constitution of the State of California are required to be authorized at an election."

█ It is clear that the revenue bonds here in issue do not come within the provisions of article XI, section 18 (now art. XIII, § 40). Since revenue bonds are payable from the revenues of an enterprise and do not create an indebtedness of the municipality, petitioner was not required by the Constitution to submit the proposed bond issue to the electorate. (*City of*

*Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 733 [290 P.2d 859]; *City of Santa Monica* v. *Grubb* (1966) 245 Cal.App.2d 718, 725 [54 Cal.Rptr. 210].)

Respondent nevertheless argues that an election is required by the Constitution. He relies on the provisions of former article XI, section 6 (now art. XI, § 5, subd. (a)), which gave to charter cities plenary authority "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters. . . ." He urges that since the Constitution limits the power of cities to the extent of their charters, the provision of petitioner's charter requiring a bond election thereby becomes a constitutional requirement. He therefore concludes that since the Constitution requires a bond election, the provisions of Government Code sections 53540 and 53541 are not available to petitioner.

Respondent's position is untenable. Although the authority to enact and enforce laws and regulations ultimately may be traced to some provision in the Constitution, it does not follow that all laws and regulations enacted pursuant to that authority are elevated to the status of a constitutional provision. To interpret section 53540 as respondent would have us do, would render section 53541 virtually meaningless. ■ It is the duty of the courts, whenever possible, to interpret statutes so as to make them workable and reasonable. (*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 197 Cal.App.2d 759, 763 [18 Cal.Rptr. 151]; *Burns* v. *Massachusetts etc. Ins. Co.* (1944) 62 Cal.App.2d 962, 971-972 [146 P.2d 24].) ■ We construe section 53540, therefore, to refer only to those provisions of the Constitution which expressly require a bond election.[6]

■ Since the Legislature, consistent with article XI, section 18 of the Constitution (now art. XIII, § 40), could eliminate entirely the requirement of voter approval of the revenue bonds in issue, it follows that it could do the lesser act in allowing the bonds to be issued at a higher rate of interest under the limited conditions of section 53541. (*Eastern Mun. Water Dist.* v. *Scott* (1969) 1 Cal.App.3d 129, 132-134 [81 Cal.Rptr. 510].)

Respondent contends, however, that the procedures authorized by Government Code section 53541 violate vested rights of the electorate. He contends that since the rate of interest was included in the bond issue proposal submitted to the electorate, and since voter approval was thereafter secured on that basis, vested rights analogous to those of a contract arose between the electorate and petitioner, which contract cannot be altered without a new election conducted for that purpose. Respondent also

---

[6]See California Constitution, article IX, section 6½.

argues that similar vested rights arose in the holders of bonds authorized and issued in 1960. We disagree.

An argument similar to that of respondent was rejected by the court in *Eastern Mun. Water Dist.* v. *Scott, supra,* 1 Cal.App.3d 129. In that case the court sustained the validity of legislation permitting water districts, under limitations similar to those of Government Code section 53541,[7] to issue certain general obligation bonds at a higher rate of interest than previously approved by the electorate without further election. Respondent there, as here, relied on this court's decision in *Peery* v. *City of Los Angeles* (1922) 187 Cal. 753 [203 P. 992, 19 A.L.R. 1044]. The court in *Peery* refused to give effect to a statutory amendment authorizing cities to issue unsold bonds at a higher rate of interest, holding that a "status analogous" to a contract had been created "through the exercise of the constitutional right of the electors of said city in approving the creation of the bonded indebtedness. . . ." (*Peery* v. *City of Los Angeles, supra,* at p. 767.) To alter the terms of the bonds "would be to accomplish a purpose directly violative of one of the essential conditions upon which the constitutional approval by the electors of said city of these bond issues was obtained. . . ." (*Peery* v. *City of Los Angeles, supra,* at p. 769.) As noted in *Scott,* however, the rationale of *Peery* is inapplicable to cases where voter approval of a bond issue was not required by article XI, section 18, of the Constitution. "The true legal basis for *Peery* was cogently expressed in *State School Bldg. Fin. Committee* v. *Betts,* 216 Cal.App.2d 685, 693 [31 Cal.Rptr. 258]: 'It is not necessary to draw contractual analogies. The logical basis for invalidating such amendments is not that they violate a metaphorical contract; rather, that they clash with the constitutional provision which required popular approval of the bonds in the first place, or, as in this case, the constitutional authority for the bond issue.' " (*Eastern Mun. Water Dist.* v. *Scott, supra,* at p. 135.) ▮ Since voter approval of the present bonds was not compelled by the Constitution, we conclude that no vested rights arose in the electorate by virtue of the initial authorization to issue the bonds.

▮ Similarly, the issuance of the proposed bonds will not impair con-

---

[7]Water Code section 71960 provides in part: "The board may, without a vote of the electors, provide for the issuance of, and issue, general obligation bonds of the district or for an improvement district thereof if:

"(a) The principal amount of such bonds do not exceed the then unissued balance of the principal amount of bonds authorized at an election held in the district, or in such improvement district, prior to May 9, 1967;

"(b) The bonds are issued for the same purpose as that for which said unissued bonds were authorized; and

"(c) The bonds are issued in accordance with the provisions of this article, except for the requirement of a bond election."

tractual rights of the holders of the bonds authorized and issued in 1960. "The contract obligation is not impaired unless the alteration . . . deprives the bondholders of a substantial right or remedy. If . . . the bondholders may enforce their rights no less effectually than before; if there has been no encroachment upon *valuable* contractual rights, then the obligations of the contract have not been impaired." (*State School Bldg. Fin. Com.* v. *Betts, supra,* 216 Cal.App.2d 685, at p. 691 [31 Cal.Rptr. 258]; *County of San Bernardino* v. *Way* (1941) 18 Cal.2d 647, 661-663 [117 P.2d 354].) An increase in the interest rate of subsequently issued bonds does not restrict the ability of the holders of bonds previously issued to enforce their contractual rights. Accordingly, no vested contract rights will be violated by petitioner's proposed bond issue.

We conclude that petitioner may properly issue the proposed revenue bonds under the provisions of Government Code section 53541 without the necessity of another election.

II. *Issuance of the bonds at co-parity and of equal lien with previously issued bonds.*

On October 11, 1960, petitioner's city council adopted a resolution providing for the issuance of $5,120,000 in revenue bonds for the construction and improvement of a city sewer system. The resolution calling for the issuance of the present bonds specified that the bonds would be of equal lien and at co-parity with the 1960 bonds heretofore issued. Respondent contends that the present bonds cannot be of equal lien and at co-parity with the 1960 bonds without a new election authorizing the issuance of the present bonds at an increased rate of interest.

The resolution adopted in 1960 authorized the issuance of additional bonds at co-parity and equality of lien if "[t]he issuance of the Additional Bonds shall have been duly authorized at an election pursuant to the Act. . . ." The term "Act" is defined in the resolution to mean section 1321 of the city charter and the Revenue Bond Law of 1941.

Respondent does not contend that the initial authorization of the sewer bonds in 1968 failed to comply with the 1960 resolution. Rather, he contends that the present bonds are new bonds, substantially different than those authorized by the electorate in 1968, which must be approved by popular vote.

It is clear from what we have determined above that the proposed bonds, issued in compliance with Government Code sections 53540 and 53541, are not new bonds. (See *Eastern Mun. Water Dist.* v. *Scott, supra,* 1 Cal.App.3d 129, at pp. 134-135.) Having once been approved by the

electorate, the revenue bonds authorized in 1968 as now proposed have met the requirements of the 1960 resolution. Accordingly, petitioner may issue the proposed bonds of equal lien and at co-parity with the previously issued bonds without another election.

Let the peremptory writ of mandate issue directing respondent to cause the notice of sale to be mailed pursuant to the resolution of petitioner's city council.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke. J., and Sullivan, J., concurred.