[Civ. No. 36913. First Dist., Div. One. Mar. 29, 1976.]

ASSOCIATED STUDENTS, SAN JOSE STATE UNIVERSITY,
Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF CALIFORNIA STATE
UNIVERSITY AND COLLEGES et al.,
Defendants and Respondents.

**COUNSEL**

Bruce I. Cornblum and von Raesfeld, Fulton & Taylor for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Harold W. Teasdale, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

ELKINGTON, J.—We are concerned on this appeal with the relationship between officials of a state university or college and its "student body organization" in the administration of the latter's funds. Our task is the interpretation of relevant portions of title 5 of the California Administrative Code (sometimes herein "regulations") and the Education Code. The regulations were promulgated by respondent Board of Trustees of California State University and Colleges (herein "Trustees"). Throughout these statutes and regulations the terms "university" and "college" are treated synonymously.

Such student body organizations, sometimes called "auxiliary organizations," are authorized and established by statute. Their purpose is to provide essential activities closely related to, but not normally included as a part of, the regular instructional program of the university. Their existence is optional, and they are organized upon a favorable vote of two-thirds of the students voting at an election held for that purpose. The organization's membership fees ($20 per student per academic year) are fixed by the Trustees. Payment of such fees by all students is mandatory upon creation of the organization. (Ed. Code, § 23801.)

Student body membership fees are collected by the officials of the school (Ed. Code, § 23802), the chief fiscal officer of which becomes their custodian (Ed. Code, § 23803; Cal. Admin. Code, tit. 5, § 42403). "These funds may be expended by the custodian only upon the submission of an appropriate claim schedule by officers of the student body organization." (Cal. Admin. Code, tit. 5, § 42403.)

Appellant Associated Students, San Jose State University (hereafter "Students"), is the student body organization of San Jose State University. For more than 10 years the Students had requested and obtained from the university's president (hereafter "President") approval of the use of a portion of their funds for "athletic grants-in-aid." This practice was not uncommon throughout the state's college and university system. The Students' budget by 1973 had reached the approximate amount of $500,000, and their contribution to such grants-in-aid had come to total about $55,000 annually; another organization, the Spartan Foundation, contributed around $30,000 of additional funds for that purpose. The average annual payment by the university to each athlete beneficiary was less than $500.

In submitting their 1973-1974 budget to the President for approval, the Students had omitted any funding for athletic grants-in-aid. This was the first time it was brought to the President's "attention that the students had any intention of terminating Grants-in-Aid in an abrupt way . . . ." After some negotiations, however, the Students agreed that $55,000 might be allocated to such grants-in-aid, and an appropriately modified budget was approved by the President.

The following year, upon presentation of the Students' 1974-1975 budget, provision for athletic grants-in-aid was again omitted. The President refused to approve the budget because, in his opinion, such an abrupt termination of the program was contrary to the "policy of the Board of Trustees and the [university's] campus." He suggested instead, in order that such funding arrangements might be made elsewhere, a plan under which the Students' participation in the program would be "phased out" over a four-year period. The parties were unable to reach an agreement.

The impasse resulted in the instant judicial proceedings, by which the Students sought a "peremptory Writ of Mandate commanding respondents to approve and release [their] 1974/1975 programs and budgets"; they also prayed for "damages" and "reasonable attorney's fees." The superior court's judgment ordered a writ of mandate which gave effect to the first step of the President's four-year phase-out plan. It ordered amendment of the Students' 1974-1975 budget to include an athletic grants-in-aid program to be funded in an amount not to exceed $39,000, and the President's approval of the budget as so amended. Damages and attorney's fees were denied. It is this judgment from which the Students have appealed.

The principal issue of the appeal, as it was at the trial, is stated by the Students as follows: "The main grievance of Appellant, Students, stated broadly, is that [their proposed budget] was not inconsistent with campus or trustee policy, and that, therefore, the President of the University ... . was without lawful power to withhold approval of the budget."

The superior court, inter alia, had made the following findings of fact:

"During the budget review process for the 1973-1974 academic year petitioner [Students] informed respondent [President] Bunzel of its intent to eliminate its financial support of the athletic grants-in-aid program in the future. Respondent Bunzel and other University officials understood

that petitioner's contribution would be phased out on a graduated basis over several years thus enabling respondent Bunzel to find other sources of funds for the program."

"On May 1, 1974, petitioner submitted a budget of $481,775.00 for the 1974/1975 fiscal year to respondent Bunzel for his review and approval. On May 22, 1974, respondent Bunzel notified petitioner that he had completed his review of the budget and that [elimination of the athletic grants-in-aid program] therein [was] inconsistent with Board of Trustees and campus policy. . . . Respondent Bunzel found this program to be inconsistent with Board of Trustees and campus policy in that the action taken by petitioner eliminated student financial support for the athletic grants-in-aid program in one precipitous action."

"The principal reason respondent Bunzel refused to approve the budget as it was presented was that it contained no funds for the grants-in-aid program. Petitioner had, for a decade or longer, allocated funds to the grant-in-aid program. For many years petitioner was the sole source of funds for this program. In the 1973-1974 academic year petitioner contributed $55,000.00 for such grants-in-aid. In recent years a portion of the funds for this program were furnished by the Spartan Foundation, a non-profit, private fund-raising foundation. The Spartan Foundation is not, at the present time, able to finance the entire grants-in-aid program. State funds, i.e., funds allocated to the State University and Colleges by the State of California, may not be used for the grants-in-aid program."

". . . Respondent's final proposal called for a phasing out of student funding of the grants-in-aid program over a four-year period. Specifically, respondents proposed the following schedule of student funding using the 1973-1974 appropriation of $55,000.00 as the base:

|     | Year    | Amount   | % Reduction | $ Reduction |
|-----|---------|----------|-------------|-------------|
| (1) | 1974-75 | $39,000  | 29%         | $16,000     |
| (2) | 1975-76 | 29,250   | 25%         | 9,750       |
| (3) | 1976-77 | 19,500   | 25%         | 9,750       |
| (4) | 1977-78 | 9,750    | 25%         | 9,750       |
| (5) | 1978-79 | –0–      | 25%         | 9,750"      |

On the issue of *reasonableness* of the President's action, the trial court found:

"The schedule for reducing and eventually eliminating student financial support of the grants-in-aid program . . . is a reasonable one in that it provides for the phasing-out of student financial support in a manner which will permit respondents to develop other sources of funding for the program."

On this issue of reasonableness the court also made conclusions of law which, at least in part, may properly be considered as findings of fact. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 323(a)(1), p. 3127.) They follow.

"Respondent [Bunzel's insistence] that petitioner's support of the grants-in-aid program be phased out on a graduated basis so that alternate sources of funds could be found to finance the program, constituted a reasonable exercise of respondent Bunzel's authority."

"Respondent Bunzel, in insisting upon continued financial support by petitioner of the grants-in-aid program at the levels and for the period set forth in the [phase-out schedule], acted reasonably, responsibly, and within the scope of his legal authority."

"Considering all the facts and circumstances, there has been no abuse of discretion by respondent Bunzel or the other respondents herein."

The President had testified, in part, as follows:

"The Grants-in-Aid program is a program of support for students who are athletes, who are brought to San Jose State and who are given monies to defray expenses from some of their fees and they, as is the case throughout all the conferences and indeed our own, make it possible for us to put together a competitive program in some nine or eleven different sports. The students who come to the University are given some assurances when they come. Those assurances are now really in the form of expectations that if they decide to come to San Jose State, that they will receive Grants-in-Aid and the expectation is that if they meet the academic standards, they will be able to continue at San Jose State in the subsequent years. Some of those students come in as freshmen, some of those students come in as transfer students, Your Honor."

"We have, for example, in many of our sports scheduled commitments which go down sometimes eight years, sometimes two years. We make those on the assumption that there won't be an abrupt termination. Those schedules need to be made in advance. These involve not only the schedule of athletic events. For example, in basketball, our basketball schedule is made for the next two years. . . . [W]hat I was trying to suggest, here, is that as an example of a consequence of the termination of a policy to which Associated Students have been a party for some ten years, that the consequence of that, for example, with respect to planning an athletic program—basketball I think I was discussing specifically—we make some of these arrangements down the road a piece because we have to schedule a great many things. We also have to give commitments to coaches, we have to give commitments to athletes, but we do this on the assumption that the programs into which we have negotiated or in which it has been a part of the policy of the campus will continue in a reasonable way. This gives us the basis upon which to go from two to five or eight years on a number of planning activities. That's policy concern, and the implication of terminating it is of one for which I have a strong sense of consequence."

". . . I don't want to jeopardize the program because our program is now and the whole program at the University is in better shape than it has been for several years, and I would hate at this time to see us jeopardize that quality program so I want to preserve the quality of the program and accommodate the students' present wish to phase it out. To do that, it seems reasonable to ask them to continue to contribute to this under the scaling-down basis and have the Spartan Foundation and any other sources we can find to help contribute to it also. We never know what the economic climate would be from one year to the next. The Spartan Foundation can make no guarantee that they are going to come up with all these monies, but I am interested in trying to accommodate the wishes of the students to phase out and, therefore, I am willing to take a gamble that the Spartan Foundation over a period of years would be able to help pick up the slack."

We note further that the evidence abundantly demonstrates the President's good faith in withholding his approval of the Students' 1974-1975 budget. Indeed, at the trial the Students offered to stipulate that the President "in fact, believes that they are important programs," and that "he has reasons."

In determining whether the trial court's findings of fact were supported by the evidence we, of course, apply the substantial evidence rule. Where the facts are in dispute, which is infrequently the case here, we consider only the evidence and such inferences reasonably derivable therefrom, as tend to sustain the findings. (See *Nestle v. City of Santa Monica,* 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)

■ Applying this test we encounter no difficulty whatever in concluding that the trial court's above-related findings of fact were supported by the evidence.

But there remains for our determination the question whether the proof, as established by the findings of fact, supports the judgment entered by the superior court.

The Education Code clearly expresses a legislative intent that "student government" is to be encouraged, and that student body organizations shall have the maximum degree of autonomy consistent with the school's general welfare. But it nevertheless provides that such organizations are to "be established . . . *under the supervision of the college officials.*" (Ed. Code, § 23801; italics added.) "All money collected . . . on behalf of a student body organization . . . shall be available *for such purposes . . . as are approved by the [Trustees].*" (Ed. Code, § 23803; italics added.) "[*T*]*he president of [the] college shall be responsible for ascertaining that all expenditures are in accordance with policies of the [Trustees, and for] the propriety of all expenditures.*" (Ed. Code, § 24054; italics added.)

Among the expressed policies of the Trustees are the following:

"*The president* of each campus is responsible for the educational effectiveness, academic excellence, and general welfare of the campus, over which he presides. As stated, auxiliary organizations operate as an integral part of the overall campus program. Therefore, for the president to exercise his responsibility over the entire campus program, he *shall require that auxiliary organizations operate in conformity with policy of the Board of Trustees and the campus.*

"To execute this authority, the president shall require that each auxiliary organization submit its programs and budgets for review at a time and in a manner specified by the president. *Should the president*

*determine that any program or appropriation planned by an auxiliary organization is not consistent with policy of the Board of Trustees and the campus, the program or appropriation shall not be implemented.* Further, should a program or appropriation which had received approval, upon review, be determined by the president to be operating outside the acceptable policy of the Board of Trustees and the campus, then that program or appropriation shall be discontinued by direction of the president until further review is accomplished and an appropriate adjustment is made." (Cal. Admin. Code, tit. 5, § 42402; italics added.)

*"Funds of an auxiliary organization shall be used for purposes consistent with Board of Trustees and campus policy."* (Cal. Admin. Code, tit. 5, § 42403; italics added.)

Among the several purposes approved by the Trustees for which student body organization funds may be expended are: (1) "*[G]rants-in-aid* for only currently admitted students and not to exceed an amount necessary for books, school fees, and living expenses"; and (2) "*Athletic programs,* both intramural and intercollegiate" (Cal. Admin. Code, tit. 5, § 42659, italics added; and see Cal. Admin. Code, tit. 5, §§ 42500, 42660).

From the foregoing statutes and regulations it becomes clear that the fiscal practices of student body organizations may not be conducted in such a manner as to disrupt established policy of the university or college. And it is the school's president who is charged with the duty of requiring that they "operate in conformity with policy of the Board of Trustees and the campus." When he reasonably determines that the organization's budgeted "program" is not consistent with such policy, "the program . . . shall not be implemented" by him.

■ It follows that a state university or college president may reject a student body organization's budget or financial "program" when he *reasonably* concludes that it is not in conformity with the policy of "the campus." We so construe the Education Code sections and California Administrative Code regulations under consideration.

An argument of the Students appears to assume, arguendo, the "reasonableness" of the President's action. But they insist that while he may have the legal authority to "veto" items improperly in their budget, he lacks power to insist that matters not in the proposed budget be placed there. In support of the argument they point out that the items

originally in the budget were such as are deemed "appropriate" by the Trustees' regulations for student body organization activity.

We find this narrow contention to be inconsistent with the obvious purpose of the several statutes and regulations, that student body organizations not unreasonably disrupt university or college *policy* by some currently desired fiscal program. And it does not take into consideration the Trustees' command that "the president . . . shall require that auxiliary organizations operate in conformity with policy of the . . . campus"; and that should "the president determine that any program . . . planned by an auxiliary organization is not consistent with policy of the . . . campus, the program . . . shall not be implemented." (See Cal. Admin. Code, tit. 5, § 42402.)

Further, we believe that such an interpretation—*proscribing* violence to established campus policy from the unreasonable *placing* of items in a student body organization's budget, while *permitting* such violence to campus policy by the device of unreasonably *omitting* such items—must be rejected as unreasonable, and therefore unintended by the Legislature and the Trustees. Statutes must be so interpreted, where possible, as to make them reasonable (*City of Santa Clara* v. *Von Raesfeld,* 3 Cal.3d 239, 248 [90 Cal.Rptr. 8, 474 P.2d 976]), and as to avoid absurd applications (*In re Cregler,* 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305]).

From the foregoing several considerations we are impelled to, and do, conclude that the superior court's determination that the President's conduct in the premises was reasonable and within the scope of his authority, and was otherwise supported by the evidence, and by the law.

It is contended by the Students that at the time of the discussions relating to the 1973-1974 budget, the President agreed that athletic grants-in-aid might be thereafter discontinued. The contention arises from a writing signed at the time by the President and the Students' representative, as follows: "The University Administration commits itself to seeking alternative funding for Athletic Grants-in-Aid and recognizes the intent of the Associated Students to eliminate funding for this item. The University's policy shall be to obtain prior Associated Students' approval before committing Associated Students funds to future Athletic Grant-in-Aid contracts." Extrinsic evidence as to the parties' intent was introduced, without objection, at the trial. The President testified: "The first sentence was to make very clear that the University would commit itself to seek alternative funding over a period of time for Grants-in-Aid;

that we agreed with the students that if student government and students on the campus did not want to fund Grants-in-Aid, that the University would seek alternative funding and that we would over a period of time eliminate this funding if the students continued to express a view that they wanted to reduce Grants-in-Aid."

The trial court found, as previously indicated, an understanding that the Students' "contribution would be phased out on a graduated basis over several years thus enabling respondent Bunzel to find other sources of funds for the program." ▮ This finding is reasonably supported by both the writing and the extrinsic evidence. And of course where, as here, conflicting extrinsic evidence is admitted to establish the contractual intent of the parties, a reviewing court may not ordinarily substitute its interpretation of an agreement for that of the trial court. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) Further, assuming arguendo the agreement contended for by the Students, it seems obvious that the President had no power to contract away his legal duty not to implement a Students' fiscal program, reasonably found to be in contravention of campus policy.

We consider now several incidental points raised by the Students.

It is urged that the university did not require $39,000 from the Students to meet the contemplated 1974-1975 athletic grants-in-aid, but instead it "wouldn't need more than [$9,000]." This figure is erroneously reached by treating the expected 128 returning grant-in-aid recipients as the total; it does not take into consideration the school's policy of continuing the program. New student athletes reasonably estimated at 61 would bring the anticipated total to 189 athletic grants-in-aid, the same as the year before.

Complaint is made that other of the trial court's findings of fact and conclusions of law were factually, and legally, unsupported. But assuming, arguendo, the claimed invalidity, such findings were surplusage and in no way impaired the findings we have adverted to, nor did they or the criticized conclusions of law in any way impugn the judgment. (See *Baglione* v. *Leué,* 160 Cal.App.2d 731, 733-734 [325 P.2d 471]; *Alonso* v. *Hills,* 95 Cal.App.2d 778, 788-789 [214 P.2d 50]; and see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 304, p. 3113.)

Nor were the President's actions, here at issue, contrary to the university's "Statement on Student Rights and Responsibilities." That

statement provides that "Student government shall be free from *arbitrary* administrative intervention in its affairs . . . ." (Italics added.) The trial court found, as we have also, no *arbitrary* administrative intervention in the Students' affairs.

Finally it is urged that: "The students are entitled to attorney's fees as well as Court costs from Respondents because they acted in Breach of Trust." Since no breach of trust has been established, the point is patently invalid.

For the above reasons we find neither error, nor abuse of discretion, by the superior court.

The judgment is affirmed.

Molinari, P. J., and Weinberger, J.,* concurred.

A petition for a rehearing was denied April 28, 1976, and appellant's petition for a hearing by the Supreme Court was denied May 26, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.