[Civ. No. 29121. Fourth Dist., Div. Two. Dec. 21, 1982.]

METROPOLITAN WATER DISTRICT OF SOUTHERN
CALIFORNIA, Petitioner, v.
KAREN E. DORFF, as Executive Secretary, etc., Respondent.

**COUNSEL**

Carl Boronkay, Warren J. Abbot and James W. Mountain for Petitioner.

Best, Best & Krieger, Arthur L. Littleworth and Francis J. Baum for Respondent.

OPINION

McDANIEL, J.—This is an original proceeding brought by the Metropolitan Water District (the district) seeking a writ of mandate to compel its secretary (respondent) to publish notice of sale of $30 million worth of bonds (series F bonds). The secretary has declined to do so thus far because she has concluded that it would be in violation of 1978 Proposition 13.

Issuance of the bonds was authorized in 1966 when, pursuant to an ordinance adopted by the district's board, an election was held and a majority of the voters voted to allow the district to "incur a bonded indebtedness in the principal sum of $850,000,000" to acquire and construct facilities for supplying the inhabitants of the district with water. The maximum rate of interest as specified in the ballot measure was not to exceed 6 percent per annum, "the actual rate or rates of interest on said bonds to be determined at or prior to the time of the sale or sales thereof."

The district issued $185 million of series A and B bonds in 1967 and 1968 at 6 percent interest. After the decision in *Eastern Mun. Water Dist. v. Scott* (1969) 1 Cal.App.3d 129 [81 Cal.Rptr. 510], which held that Water Code section 71960 authorized municipal water districts to issue general obligation bonds at a higher rate of interest than that set out in the original bond measure, the district issued $300 million of series C, D and E bonds in 1970, 1971, and 1972 at 7 percent interest.[1]

Proposition 13 was approved in June 1978, and took effect as article XIII A of the California Constitution on July 1, 1978. Proposition 4, the "Spirit of 13" initiative, took effect as article XIII B on July 1, 1980.

On July 8, 1982, the district's board adopted resolutions authorizing the issuance and sale of $30 million of series F bonds at an interest rate not to exceed 12 percent per annum, pursuant to Government Code section 53541.[2] The resolution directed the secretary to publish notice of the sale. The secretary refused. She based her refusal on the ground that bonds with a maximum interest rate higher than that in effect at the time of voter approval are not "indebtedness approved by the voters prior to [July 1, 1978]," and that therefore the ad valorem taxes necessary to pay the debt service on the bonds did not come under the exclusion in section 1, subdivision (b) of article XIII A. Section 1, subdivision (b) excludes taxes levied to pay interest and redemption charges on indebtedness approved by the voters prior to July 1, 1978, from the

[1]The C, D and E bonds were issued pursuant to section 233 of the Metropolitan Water District Act. Section 233 contained essentially the same wording as Water Code section 71960.

[2]Government Code section 53541 is similar in language to both Water Code section 71960 and section 233 of the Metropolitan Water District Act.

calculation of maximum ad valorem taxes as set out in section 1, subdivision (a).

As a consequence of the refusal noted, the issues presented by the petition are whether or not the series F bonds are "indebtedness approved by the voters prior to [July 1, 1978]" and whether or not, after the enactment of article XIII A, water district voters have constitutional or contractual rights which supersede the provisions of Government Code section 53541.

I.

Article XIII A, section 1, provides:

"(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective."

■ The district contends that it is the "indebtedness" which must have been approved by the voters before July 1, 1978; respondent contends that the required approval must extend to the "interest" as well as to the indebtedness. If respondent's interpretation is correct, then the voters approved the original 6 percent interest in 1966, but have not approved the 12 percent interest adopted by the district's board in 1982.

■ It is a rule of statutory construction, if there exists an uncertainty or ambiguity in a statute, that qualifying words, phrases, or clauses are construed as referring to the immediately preceding words, phrases, and clauses. (*Elbert, Ltd.* v. *Gross* (1953) 41 Cal.2d 322, 326-327 [260 P.2d 35]; *County of Los Angeles* v. *Graves* (1930) 210 Cal. 21, 26-27 [290 P. 444].)

■ We do not think the statute is ambiguous about what must be approved. However, we will assume, for the sake of argument, that an ambiguity, appearing from the parties' respective interpretations of the statute, does exist. Applying the above rule of construction, we conclude that the phrase, "approved by the voters" refers to and qualifies the immediately preceding phrase "any indebtedness," and not the more remote phrase "interest and redemption charges."

The secretary may still argue that the term "indebtedness" in itself includes interest as well as principle. This argument is likewise not persuasive.

Both article XIII A and XIII B, as well as code sections enacted to implement them, use the terms "interest and redemption charges," "interest," "principal," and "indebtedness." (See, e.g., art. XIII A, § 1, subd. (b); art. XIII B, § 8, subd. (g); Rev. & Tax. Code, § 93, subd. (a).) For example, section 1, subdivision (b) states that the section 1, subdivision (a) limitation "shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters . . . ." If the drafters of this section had intended that "indebtedness" be synonymous with "interest and redemption charges," the section could have been worded "shall not apply to ad valorem taxes or special assessments to pay any indebtedness approved by the voters." ■ Every word employed in a statute is presumed to have been intended to have a meaning and to perform a useful function, and the presumption is that the drafters used the terms advisedly and with the intention that each term should be given a different meaning (*Fischer* v. *County of Shasta* (1956) 46 Cal.2d 771, 775-776 [299 P.2d 222]), and a construction which makes some words surplusage is to be avoided. (*People* v. *Gilbert* (1969) 1 Cal.3d 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580].) ■ This reasoning, and the rules of construction noted earlier, apply equally well to similar language contained in article XIII B, section 8, subdivision (g),[3] which section respondent urges also supports her interpretation of the phrase "indebtedness approved by the voters."

Finally, we are intrigued by petitioner's position at oral argument that because the obvious purpose of Proposition 13 was to limit drastically the power of local entities to levy ad valorem taxes, it necessarily follows that any exceptions written into the constitutional amendment in mitigation of this new restriction should be broadly construed in favor of the objectives of that exception. We can find no authority for this proposition, but in light of the uniqueness of Proposition 13 and the obvious intendment of the exception, we are willing to accept it. For the foregoing reasons we therefore hold that "indebtedness" as used in the amendment refers to the *principal* sum of the bonds as distinguished from the interest and redemption charges.

## II.

■ Respondent contends that article XIII A now gives voters a constitutional right to approve all general obligation bonds, including those issued by a

---

[3]Article XIII B, section 8, subdivision (g), provides: " 'Debt service' shall mean appropriations required to pay the cost of interest and redemption charges, including the funding of any reserve or sinking fund required in connection therewith, on indebtedness existing or legally authorized as of January 1, 1979 or on bonded indebtedness thereafter approved according to law by a vote of the electors of the issuing entity voting in an election for such purpose."

water district. Therefore, she argues, the rationale in *Eastern Mun. Water Dist. v. Scott, supra,* 1 Cal.App.3d 129, no longer applies. The rational in *Scott* was that the Legislature could enact legislation such as Water Code section 71960 and Government Code section 53541, thus allowing a water district to increase the interest rate on already-approved bonds, because the voters had no constitutional right to approve the bonds in the first place.

The constitutional right of voters to approve indebtedness comes from article XVI, section 18, which provides that counties, cities, towns, townships, boards of education, and school districts may not incur indebtedness exceeding yearly income and revenue without the assent of two-thirds of the voters. Article XVI, section 18, still applies only to the entities enumerated above, and not to water districts. However, respondent attempts to extend this constitutional right to the voters of a water district by resort to convoluted reasoning, which we shall set forth:

(1) General obligation bonds, by definition, are payable from unlimited ad valorem taxes;

(2) The series F bonds are general obligation bonds;

(3) The series F bonds are therefore, by definition, payable from unlimited ad valorem taxes;

(4) Article XIII A, section 1(a) limits ad valorem taxes to one percent of the full cash value of real property;

(5) Because ad valorem taxes are limited to one percent by section 1(a), and because general obligation bonds by definition are payable from unlimited ad valorem taxes, no general obligation bonds may be issued after July 1, 1978;

(6) The series F bonds are general obligation bonds, and therefore may not be issued after July 1, 1978;

(7) However, cities, counties, and special districts (including water districts) may impose taxes with the approval of two-thirds of the voters (art. XIII A, § 4);

(8) Issuance of general obligation bonds necessarily requires the imposition of taxes;

(9) Because article XIII A, section 4, requires the approval of two-thirds of the voters before a tax may be imposed, voters, including water district voters, have a constitutional right to approve the issuance of general obligation bonds;

(10) The series F bonds are general obligation bonds;

(11) Therefore, the water district voters now have a constitutional right to approve the series F bonds.

Once respondent's argument is broken down into these steps, the flaw in this reasoning becomes apparent. First, *if* step (5) is correct, *no* general obligation bonds may be issued after July 1, 1978, regardless of whether or not they are approved by the voters, because, by definition, they are based on *unlimited* ad valorem taxes, and ad valorem taxes are now constitutionally *limited* to one percent of the full cash value of real property. Next, as indicated at step (7), water district voters may impose taxes by a two-thirds vote as provided by article XIII A, section 4. However, that section refers to the imposition of *special* taxes, and states that *ad valorem* taxes may not be imposed at all. If the voters have no right to impose ad valorem taxes, how can they have a constitutional right to approve the issuance of general obligation bonds such as the series F bonds which, as respondent asserts, are defined as being payable from unlimited ad valorem taxes? Obviously, step (9) is incorrect, and therefore step (11) must fail. The constitutional right of water district voters to approve general obligation bonds in general, and the series F bonds in particular, does not exist.

Respondent has ignored the effect of the section 1(b) exclusion on her reasoning. Inserting section 1(b) into the steps above, and using the reasoning outlined in our earlier discussion of the meaning of the phrase "indebtedness approved by the voters," we reach the following result:

(1) General obligation bonds, by definition, are payable from unlimited ad valorem taxes;

(2) The series F bonds are general obligation bonds;

(3) The series F bonds are therefore, by definition, payable from unlimited ad valorem taxes;

(4) Article XIII A, section 1(a), limits ad valorem taxes to one percent of the full cash value of real property;

(5) Article XIII A, section 1(b), excludes from the section 1(a) limitation ad valorem taxes levied to pay the interest and redemption charges on any indebtedness approved by the voters prior to July 1, 1978;

(6) Indebtedness approved by the voters prior to July 1, 1978, refers to the principal sum of the bonds, as distinguished from interest and redemption charges;

(7) The voters in this case approved the indebtedness as defined above in 1966, well before July 1, 1978;

(8) The exclusion in section 1(b) therefore applies to ad valorem taxes necessary to pay the interest and redemption charges on the indebtedness approved in 1966;

(9) The fact that a portion of the approved indebtedness (represented by the series F bonds) was not *issued* until after July 1, 1978, is of no consequence, because the section 1(b) exclusion only requires that the indebtedness have been *approved* before July 1, 1978;

(10) Article XIII A does not give water district voters a constitutional right to approve the issuance of general obligation bonds in general or the series F bonds in particular;

(11) Government Code section 53541's provisions are applicable unless the voters have a constitutional right to approve the initial bond issuance (which they do not), or there is an irreconcilable conflict between section 53541 and article XIII A (which there is not);

(12) Therefore, Government Code section 53541 is still applicable under the circumstances of this case, and the water district may, pursuant to its provisions, issue the series F bonds at a rate of 12 percent interest.

This result does not conflict with the purpose of article XIII A and XIII B. While the purpose of XIII A and XIII B is to limit the growth of both ad valorem real property taxes and general taxes (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal. Rptr. 239, 583 P.2d 1281]), it is clear from the language of article XIII A, section 1(b) and article XIII B, section 9(a) and 8(g), that the voters also intended to allow increases in ad valorem taxes and special assessments for the payment of interest and redemption charges on already-approved indebtedness. This intent, as well as the purpose of the enactment, are both effectuated by our holding here.

In addition, this result avoids the repeal by implication of Government Code section 53541. ■ Repeal by implication only arises when there is an irreconcilable conflict between a new enactment and existing legislation, and the presumption is against repeal by implication, particularly where the existing

legislation has been generally understood and acted upon (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252]), as is the case with section 53541, which has been twice reenacted since 1978. (Stats. 1980, ch. 19, § 3, eff. Feb. 28, 1980; 1981 Cal. Legis. Serv., ch. 1098, § 7, eff. Jan. 1, 1982.) Such contemporaneous construction is entitled to great weight in the judicial interpretation of ambiguous constitutional provisions. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 245-246.)

## III.

■ Respondent also contends, even if no constitutional right to approve the higher interest rate exists, that a contractual relationship exists between the voters and the district, and this contractual relationship prevents the district from issuing bonds at the higher rate. To support this proposition, she attempts to differentiate between constitutional rights and contractual rights as the basis for the decisions in *Eastern Mun. Water Dist.* v. *Scott* (1969) 1 Cal.App.3d 129 [81 Cal.Rptr. 510], and *City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239 [90 Cal.Rptr. 8, 474 P.2d 976]. Both cases held that the procedures authorized by Water Code section 71960 and Government Code section 53541, respectively, did not violate vested rights of the voters.

Respondent reads these two cases as being based solely on the lack of constitutionally protected rights of the voters, not on the lack of contractual rights. However, the cases make it clear that the two types of rights are related:

The opinion in *Von Raesfeld* is definitive on the point: "Respondent contends, however, that the procedures authorized by Government Code section 53541 violate vested rights of the electorate. He contends that since the rate of interest was included in the bond issue proposal submitted to the electorate, and since voter approval was thereafter secured on that basis, vested rights analogous to those of a contract arose between the electorate and petitioner, which contract cannot be altered without a new election conducted for that purpose. . . . We disagree.

"An argument similar to that of respondent was rejected by the court in *Eastern Mun. Water Dist.* v. *Scott, supra,* 1 Cal.App.3d 129. In that case the court sustained the validity of legislation permitting water districts, under limitations similar to those of Government Code section 53541, to issue certain general obligation bonds at a higher rate of interest than previously approved by the electorate without further election. Respondent there, as here, relied on this court's decision in *Peery* v. *City of Los Angeles* (1922) 187 Cal. 753 [203 P. 992, 19 A.L.R. 1044]. The court in *Peery* refused to give effect to a statutory amendment authorizing cities to issue unsold bonds at a higher rate of interest,

holding that a 'status analogous' to a contract had been created 'through the exercise of the constitutional right of the electors of said city in approving the creation of the bonded indebtedness. . . .' (*Peery* v. *City of Los Angeles, supra,* at p. 767.) To alter the terms of the bonds 'would be to accomplish a purpose directly violative of one of the essential conditions upon which the constitutional approval by the electors of said city of these bond issues was obtained. . . .' (*Peery* v. *City of Los Angeles, supra,* at p. 769.) As noted in *Scott,* however, the rationale of *Peery* is inapplicable to cases where voter approval of a bond issue was not required by article XI, section 18, of the Constitution. 'The true legal basis for *Peery* was cogently expressed in *State School Bldg. Fin. Committee* v. *Betts,* 216 Cal.App.2d 685, 693 [31 Cal.Rptr. 258]: "It is not necessary to draw contractual analogies. The logical basis for invalidating such amendments is not that they violate a metaphorical contract; rather, that they clash with the constitutional provision which required popular approval of the bonds in the first place, or, as in this case, the constitutional authority for the bond issue." ' (*Eastern Mun. Water Dist.* v. *Scott, supra,* at p. 135.) Since voter approval of the present bonds was not compelled by the Constitution, we conclude that no vested rights arose in the electorate by virtue of the initial authorization to issue the bonds." (*City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d 239, 248-249, fn. omitted.)

In other words, no vested rights, contractual or otherwise, arise in the voters upon approval of a bond issue unless they had a constitutional right to approve the initial authorization.

Respondent also urges that it is not fair to hold that the voters were on notice as of 1966 that the Legislature could make later changes in the maximum interest rate of the bonds, and that the argument that their approval of the bond issue was made with the understanding that such changes could be made "is nothing more nor less than a seductive sophistry, since to give it the application for which the respondents contend would be to render every substantial statutory or contractual right of individuals subject to be taken away for no better reason than that they had acted or contracted in view of possible changes in the law." (*Peery* v. *City of Los Angeles, supra,* 187 Cal. 753, 764.)

However, as the court in *Peery* noted, "There is one comprehensive answer to . . . the foregoing [argument]. . . . The constitution, . . . gives to the electors of a municipality the substantial right to grant or refuse their approval to the incurring of any indebtedness beyond the limit expressed in said constitutional provision." (*Id.,* at pp. 764-765.) As noted earlier, no such constitutional rights exist in the present case, and the decisions in *City of Santa Clara* v. *Von Raesfeld, supra,* and *Eastern Mun. Water Dist.* v. *Scott, supra,* make it clear that in the absence of such rights the Legislature could increase the in-

terest of already-approved water district bonds regardless of whether the voters had notice that such a change were possible.

Otherwise, a good argument can be made that the foregoing marshalling and distinguishing of court decisions begs the question. Section 53541 was on the books when the voters adopted Proposition 13, and it had been relied upon by petitioner several times following the basic approval of the $850 million issue in 1966. ■ Reverting then to the respondent's contractual rights contention, it is fundamental contract law that any contract entered into necessarily contemplates all valid and subsisting law which could affect the contract's terms. (*Lelande* v. *Lowery* (1945) 26 Cal.2d 224, 226 [157 P.2d 639, 175 A.L.R. 1109]; *Bell* v. *Minor* (1948) 88 Cal.App.2d 879, 881 [199 P.2d 718].) Therefore, although it is in fact a fiction, we can yet hold that, when the voters adopted Proposition 13, they "intended" that it be subject to the provisions of section 53541.

Therefore, let a writ of mandate issue as prayed.

Morris, P. J., and Kaufman, J., concurred.