1 Cal.Rptr.3d 837 (2003)
110 Cal.App.4th 636
CITY OF LONG BEACH, Plaintiff and Respondent,
v.
DEPARTMENT OF INDUSTRIAL RELATIONS, Defendant and Appellant.
No. B159333.
Court of Appeal, Second District, Division Seven.
July 14, 2003.
Review Granted October 1, 2003.
*840 John M. Rea, Chief Counsel, Steven A. McGinty, Assistant Chief Counsel, Anthony Mischel, Staff Counsel, Department of Industrial Relations, for Defendant and Appellant.
Robert E. Shannon, City Attorney, Daniel S. Murphy, Principal Deputy, City of Long Beach, for Plaintiff and Respondent.
Altshuler, Berzon, Nussbaum, Rubin & Demain, Stephen P. Berzon, Scott A. Kronland, San Francisco, and Victor M. Ortiz-de-Montellano, for The State Building and Construction Trades Council of California, AFL-CIO as Amicus Curiae on behalf of Defendant and Appellant.
Rutan & Tucker, M. Katherine Jenson and Mark J. Austin, Costa Mesa, for 44 California Cities as Amici Curiae on behalf of Plaintiff and Respondent.
JOHNSON, J.
The Department of Industrial Relations appeals from a judgment granting a petition for writ of mandate filed by the City of Long Beach. The city seeks to overturn the department's determination a construction project financed in part with city funds was subject to the state's prevailing wage law, Labor Code section 1720 et seq.
We conclude when a city contributes its funds to a private non-profit organization for the specific purpose of constructing a facility to be used by the general public the facility is a "public work" within the meaning of Labor Code section 1720 and therefore subject to the state's prevailing wage law.
We further conclude the city's status as a charter city does not exempt the project from the state's prevailing wage law for two independently sufficient reasons: (1) the animal shelter is not a strictly municipal affair and (2) the state's prevailing wage law addresses matters of statewide concern.
We also reject the city's arguments the department is barred by the doctrines of estoppel and laches from making a coverage determination in this case.

FACTS AND PROCEEDINGS BELOW The facts are not in dispute.
*841 In 1998, the City of Long Beach (City) entered into an agreement with the Los Angeles Society for the Prevention of Cruelty to Animals (SPCA-LA) under which it agreed to contribute $1.5 million to the construction of a facility in the City which would serve as an animal shelter and the administrative headquarters of the SPCLA-LA as well as provide kennels and office space for the City's animal control department.
The agreement required the City's funds be placed in a segregated account and used only for expenses related to development of the project including SPCA-LA's "investigation and analysis" of the property on which the shelter was to be built, "permit, application, filing and other fees and charges" and "design and preconstruction costs." The SPCA-LA was specifically precluded from using any of the City's funds "to pay overhead, supervision, administrative or other such costs" of the organization or in support of any "political activity." The agreement further provided it was "interdependent" with lease and lease-back agreements between the parties with respect to the City land on which the project would be built and "if either the lease or lease-back is terminated, then this agreement shall also terminate automatically and without notice." Finally, the agreement provided "[i]f there is a claim relating to the payment of wages arising from the construction described herein" the City shall pay 95 percent of "all costs, expenses, penalties, payments of wages, interest, and other charges related to the claim, including attorneys' fees and court or administrative costs and expenses[.]"
Acting on an inquiry by a labor organization, the Department of Industrial Relations (DIR) began an investigation to determine whether the project was a "public work" under Labor Code section 1720[1] and therefore subject to the prevailing wage rates mandated by section 1771.[2] The City took the position the project was not a public work but even if it was the prevailing wage law did not apply because the project was a strictly "municipal affair" of a charter city. Following its investigation the DIR concluded the project was a public work and was not exempt from the prevailing wage law by reason of the City's status as a charter city. This determination was affirmed on an administrative appeal.
Evidence submitted by the City on its administrative appeal showed approximately $1 million of the City's $1.5 million contribution was spent on architecture ($318,333), project management ($440,524), legal fees ($16,645), surveying ($14,500), and insurance ($23,478). Evidence obtained from the SPCA-LA showed the project was intended to serve the entire Los Angeles County area and parts of Orange County. Animals from all these areas would be housed at the shelter, not just animals from Long Beach. In addition, the facility would also house the SPCA-LA's headquarters.
When the City lost its administrative appeal it filed a petition for a writ of mandate under Code of Civil Procedure section 1085 challenging the DIR's decision the state's prevailing wage laws applied *842 to the shelter project. In addition to contending it was exempt from the prevailing wage law the City contended the DIR was barred by the doctrines of estoppel and laches from determining its charter city exemption did not apply to this project. The trial court granted the writ based on the City's first two contentions. It did not address the estoppel and laches arguments. The DIR filed a timely appeal.
For the reasons discussed below we reverse.

DISCUSSION

I. STANDARD OF REVIEW.

The DIR's determination a project is subject to the prevailing wage law is a quasi-legislative decision reviewable by traditional mandate proceedings under Code of Civil Procedure section 1085.[3] Where, as here, the facts are undisputed, we review the DIR's determination de novo.[4]
In conducting our review we bear in mind California's prevailing wage law was enacted to protect and benefit workers and the public[5] and is to be liberally construed.[6] This is especially so in the present case where the question is not whether the workers are entitled to receive prevailing wages as determined by the DIR or as determined by the City but whether they are entitled to receive prevailing wages at all.

II. THE ANIMAL SHELTER PROJECT IS A "PUBLIC WORK."

At the time the City entered into its agreement with the SPCA-LA, section 1720, subdivision (a) defined "public works" as "[construction, alteration, demolition, or repair work done under contract and paid for in whole or in part out of public funds ..."[7] The DIR contends, and we agree, the facility at issue here is a "public work" as defined in section 1720.
Under section 1720 a project is a public work if it meets three criteria: (1) the project involves construction, alteration, demolition or repair work; (2) the work is done under contract; and (3) the work is paid for in whole or in part out of public funds.
In deciding whether the project at issue is a public work the principal issue is the meaning of the word "construction."
The DIR interprets "construction" broadly to include the planning, design and pre-building phases of a project such as architectural design, project management and surveyingall of which were undisputedly paid for out of the City's financial contribution to the project at issue here.
The DIR's position is supported by the common meaning of the word "construction," its own regulations interpreting and implementing the prevailing wage law and an opinion by the California Attorney General regarding prevailing wage coverage for city engineers.
Our state-issued dictionary gives as the primary meaning of the word construction *843 "[t]he act or process of constructing."[8] Similarly, in Priest v. Housing Authority, the court observed when "one thinks of `construction' one ordinarily considers the entire process ... which may be required in order to erect [a] ... structure."[9]
The DIR has long held the view "construction" means more than simply erecting a structure. It also includes activities "integral to the specific public works project in the design, preconstruction, or construction phase."[10] Since at least 1978, the DIR has taken the position "`[s]urveying, whether performed in the preparation or construction stage, is a necessary prerequisite and integral part of construction without which the work could not proceed and is performed by the type of classification of worker intended to be covered by the [prevailing wage law].'"[11] The contemporaneous construction of a statute by the administrative agency charged with its enforcement is, of course, entitled to great weight and will be overruled only if it is clearly erroneous or unauthorized.[12]
The California Attorney General applied the DIR's reasoning with respect to surveyors to hold the prevailing wage law covered the employees of an engineering firm hired to perform the duties of city engineer.[13]
The City interprets "construction" narrowly to mean only the actual building of the facilityhammering nails, spreading mortar, installing pipes, and the like.
The City offers little support for this narrow interpretation. It chiefly relies on the fact that after the agreement was signed and work began on the project the Legislature amended section 1720, subdivision (a) by adding a sentence stating: "For purposes of this subdivision, `construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work."[14] The City views this amendment as a change in the law demonstrating that before its enactment the term "construction" did not include work performed during the design and preconstruction phases of construction. The legislative history of the amendment, however, shows it was not intended as a change in the law. Rather, "[t]he bill codifies current Department practice by including inspectors and surveyors among those workers deemed to be employed upon public works and by insuring that workers entitled to prevailing wage during the construction phase of a public works project will get prevailing wage on the design and pre-construction phases of a project."[15]
*844 There is some support for the City's view in the United States Department of Labor's interpretation of the federal prevailing wage law, the Davis-Bacon Act.[16] The Secretary of Labor has defined "construction," for purposes of the Davis-Bacon Act as: "All types of work done on a particular building or work at the site thereof, ... by laborers and mechanics employed by a construction contractor or construction subcontractor...."[17] "Laborers and mechanics" generally include "those workers whose duties are manual or physical in nature (including those workers who use tools or who are performing the work of a trade), as distinguished from mental or managerial."[18] This definition would not cover work done by project managers, lawyers or insurance underwriters. We have found no case deciding whether work done by surveyors constitutes "construction" under the federal regulations. In any event, while California's prevailing wage law is "`similar to the Davis-Bacon Act'" and shares its purposes,[19] the Legislature and the DIR are free to adopt a broader definition of construction for projects covered by state law.[20]
In our view the word "construction" as used in section 1720, subdivision (a) should be interpreted broadly to include not only the actual building of a structure but the activities integrally connected to the actual building and without which the structure could not be built. This interpretation is most consistent with the purpose of the prevailing wage law to protect employees and the public.[21] Under this interpretation, activities such as architectural design, project management, legal services, surveying and insurance are part of a project's "construction" for purposes of the California prevailing wage law.
Because it is undisputed City funds were used for architectural design, project management, legal services, surveying and insurance the construction was "paid for in whole or in part out of public funds."[22]
The DIR contends the statutory requirement the construction be "done under contract" was satisfied because the shelter was constructed by private sector employees, not by City employees. "[T]he Legislature generally requires `prevailing wages' to be paid to those who are employed on `public works' that are performed by a private contractor and paid for in whole or in part with public funds."[23]
*845 The City nevertheless argues the term "done under contract" means done under a contract between the public entity or its agent and the contractor. As we understand the City's argument it rests on section 1722 which defines an "`awarding body'" or "`body awarding the contract'" as the "department, authority, officer or agent awarding a contract for public work." The DIR has expanded this definition by regulation to embrace other public bodies including political subdivisions.[24] The City reasons the contract referred to in section 1720, subdivision (a) must be a contract awarded by one of the bodies listed in section 1722 or DIR regulations. The City asserts it did not contract for the construction of the shelter with anyone. The contracts for construction of the project were made by the SPCA-LA. Furthermore, the City contends, it is not a "department," "authority" or an "officer" nor did the SPCA-LA contract as the City's agent on its behalf. The City also maintains it is not a political subdivision.[25]
The City's argument incorrectly assumes there must be a public "awarding body" in order for the prevailing wage law to apply to the laborers on a construction project funded in whole or in part out of public funds.
In its precedent decisions the DIR has consistently held section 1720 does not require the public entity which pays for the construction be the entity which awards the contract or even that it be a party to the contract.[26]
Case law is in accord.
In Lusardi Construction, a public hospital district seeking to expand its facilities and keep construction costs as low as possible entered into a contract with a private corporation for the construction of the new facility. The private corporation appointed the hospital district as its agent for all purposes on the project. The hospital district, acting as agent for the corporation, then hired a private contractor to construct the new facility without requiring payment of the state prevailing wage rate. When the Division of Labor Standards Enforcement sought to enforce the prevailing wage the contractor argued the law is only enforceable when a provision requiring its observance is contained in a contract between a public agency and the contractor. Here the contract was purportedly between two private corporations and the contract did not call for payment of the prevailing wage.[27]
The Supreme Court rejected the contractor's argument and held the duty to pay prevailing wages under state law is not a contractual duty but a statutory one.[28] The court relied on section 1771 which states: "[N]to less than the general prevailing rate of per diem wages ... shall be paid to all workers employed on public works." Thus, although "the awarding body has a variety of responsibilities designed to help ensure that workers are *846 paid the prevailing wages on public works"[29] the duty to pay prevailing wages does not depend on who awards the contract but on whether the contract is for public works.[30]
The court further observed the public entity and the contractor "may have strong financial incentives not to comply with the prevailing wage law."[31] Construing the prevailing wage law to only apply when the contractor and the public entity have included it in the contract language "would encourage awarding bodies and contractors to legally circumvent the law, resulting in payment of less than the prevailing wage to workers on construction projects that would otherwise be deemed public works."[32] To allow this result, the court stated, "would reduce the prevailing wage law to merely an advisory expression of the Legislature's view."[33]
Similarly, in the present case, if we accepted the City's interpretation of section 1720 a public entity and a contractor could avoid the prevailing wage law simply by laundering the public funds through a non governmental third party such as, the SPCA-LA.[34]
For the reasons stated above, we conclude the shelter was a public work for purposes of California's prevailing wage law.

III. THE ANIMAL SHELTER IS NOT A STRICTLY MUNICIPAL AFFAIR AND THEREFORE THE CITY'S STATUS AS A CHARTER CITY DOES NOT EXEMPT THE PROJECT FROM THE STATE'S PREVAILING WAGE LAW.

As a charter city, Long Beach enjoys autonomous rule over its "municipal affairs" pursuant to article XI, section 5 of the California Constitution.[35] The city's autonomy gives way, however, to matters which are of "statewide concern"[36] or at least of regional concern[37] and not "purely,"[38] "strictly,"[39] or "merely"[40] municipal affairs.
*847 What constitutes a "municipal affair" is not always an easy question.[41] Indeed, our Supreme Court has admitted "[n]o exact definition of the term `municipal affairs' can be formulated[.]"[42] Instead, the high court has held "the task of determining whether a given activity is a `municipal affair' ... is an ad hoc inquiry" which can only be answered "in light of the facts and circumstances surrounding each case."[43] The high court has, however, provided us with some guidance "intended to bring a measure of certainty to the process" of determining whether an activity is a municipal affair.[44] We apply this guidance in the discussion to follow.
When a court is asked to resolve a putative conflict between the state's authority and a chartered city's autonomy the court first "must satisfy itself that the case presents an actual conflict between the two."[45]
Where a genuine conflict exists, the next question is whether the city's activity involves a strictly municipal affair because the constitution grants charter cities sovereignty only over those matters deemed to be "municipal affairs."[46] In cases where the two preliminary conditions are satisfiedthere is a conflict between the chartered city's activity and state law and the city's activity implicates a "municipal affair"the question of statewide concern is the "bedrock inquiry" through which the state and local interests are adjusted.[47] "If ... the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related [and narrowly tailored] to its resolution, then the conflicting charter city measure ceases to be a municipal affair pro tanto and the Legislature is not prohibited by article XI, section 5 ... from addressing the statewide dimension by its own tailored enactments."[48] Our Supreme Court has described the mediation of jurisdictional conflicts between charter cities and the Legislature as one which focuses on "extramunicipal concerns as the starting point for analysis."[49] Legislative supremacy, the court has stated, requires "a dimension demonstrably transcending identifiable municipal interests."[50] The terms municipal affair and statewide concern, the court explained, are not factual descriptions but "ultimate legal conclusions" resulting from "the difficult but inescapable duty of the court to ... allocate the governmental powers under consideration in the most sensible and appropriate *848 fashion as between local and legislative bodies."[51]
Finally, even if we find the presence of a statewide concern in the legislation we must determine whether the Legislature's response to that concern "is narrowly tailored to resolve the problem at hand" as demonstrated "by the limited extent of the [state's] incursion" into the municipality's interests.[52]
We are satisfied a genuine conflict exists here. Although a conflict may exist between state and local authority even if the city has not specifically legislated on the matter through its charter,[53] in the present case the City has adopted its own prevailing wage law which differs in material respects from the state law on the subject.[54]
Moving to the second question, we hold the state's prevailing wage law applies to the animal shelter project because the project itself is not a strictly municipal affair.
We acknowledge at the outset a split of authority exists over whether the term "municipal affair," when applied to contract cases, refers to the subject matter of the contract or to the mode of contracting or both.
Although our Supreme Court has not resolved this question the court, in dictum, has expressed the view that the term "municipal affair" applies to the mode of contracting "appears the better supported by authority[.]"[55] As support for its statement, the court pointed to decisions such as Smith v. City of Riverside[56] and Piledrivers' Local Union v. City of Santa Monica[57] in which appellate courts held notwithstanding the extra-municipal interest in the subject matter of the contracts electrical facilities and ocean piersWthe mode of making contracts for these projects was within the realm of the cities' municipal affairs.[58]
On the other hand there is substantial authority, including the Supreme Court's own decisions, linking the applicability of *849 the prevailing wage law to the purely municipal nature of the projects being constructed.
In City of Pasadena v. Charleville,[59] the city manager refused to sign a contract authorized by the city's board of directors for the construction of a galvanized fence around a reservoir owned and operated by the city as part of its municipal water supply system. The city manager balked at signing the contract, in part, because it did not provide for the payment of wages under the state's prevailing wage law. The city took the position the state prevailing wage law did not apply to it because it was a chartered city and "the improvement contemplated by the proposed contract constitutes a `municipal affair'...."[60] The Supreme Court agreed with the city. It found: "The supplying of water by a city to its inhabitants is a municipal affair. The building of a dam to be used for impounding water for a municipal water system is a municipal affair. The construction of a reservoir as a part of a municipal water system is a municipal affair. The money to be expended for the cost of the improvement belongs to the city and the control of its expenditure is a municipal affair. * * * It necessarily follows [the state prevailing wage law] is not effective, binding or controlling on the [city] in connection with the execution and performance of the proposed contract, and the refusal of the respondent to sign the contract based on the ground that the provisions of the Public Wage Rate Act of 1931 were not complied with in the letting thereof is not justifiable."[61]
In Southern California Roads Co. v. McGuire, the question was whether improvements on Sepulveda Boulevard in the City of Los Angeles, a chartered city, were subject to the state prevailing wage law. Relying on City of Pasadena, the city argued improvements of its street was a municipal affair and therefore the state prevailing wage law was not "applicable to the contract providing for its improvement."[62] The Supreme Court disagreed. The court pointed out the funding for the street improvement came from the state and federal governments and the city had virtually no control over how the money was to be spent or how the street was to be improved and maintained.[63] These circumstances, the court found, indicate "beyond any question that the work of improving said street is not merely a local or municipal affair of the city, but that it is an affair in which the state has a direct and vital interest."[64]
In City of Santa Clara v. Von Raesfeld, the Supreme Court held the city's sale of municipal bonds to fund its share of a regional water pollution control facility was not a municipal affair because "the sewage treatment facilities will protect not only the health and safety of [the city's] inhabitants, but the health of all inhabitants of the San Francisco Bay Area."[65] *850 Vial v. City of San Diego[66] involved an ordinance of a charter city declaring payment of prevailing wages to be appropriate "`only when required by Federal or State grants and on other jobs considered to be of State concern....'" The issue was whether the ordinance impermissibly conflicted with the state's prevailing wage law.[67] Avoiding a decision on whether the payment of prevailing wages is, in the abstract, a "municipal affair" or a matter of "statewide concern," the court held the state prevailing wage law "does not apply to the public works projects of a chartered city, as long as the projects in question are within the realm of `municipal affairs' [citation]."[68]
As these cases demonstrate, a project may be a "public work" under section 1720 but may or may not be a purely "municipal affair" under Article XI, section 5.
While recognizing courts have expressed different views on the question, and acknowledging the Supreme Court's dictum favoring an approach which focuses on the process not the project,[69] we are inclined to follow Vial and its holding the public projects of a chartered city are only exempt from the state's prevailing wage law if the projects in question are "within the realm of `municipal affairs.'"[70]
We reach this conclusion for several reasons.
The city's mode of contracting, whether it relates to bidding procedures, performance bonds or payment of wages does not occur in a vacuum. It is necessarily linked to a public project. The municipality's interest in the project, and therefore its interest in the mode of contracting for the project, decreases as the externality of the project increases. In other words, the more the effects of the project extend beyond the borders of the acting municipality the less the project occupies the realm of a municipal affair.[71] For example, bond issues to finance municipal sewer projects historically have been treated as municipal affairs but when a given sewer project transcends municipal boundaries and affects navigable waters and public health it "cease[s] to be a municipal affair and come[s] within the proper domain and regulation of the general laws of the state."[72]
Similarly, as the amount of municipal funds contributed to the project lessens and the amount of control the municipality has over the project diminishes so too does the municipality's interest in the project. As discussed above, this was the rationale for the Supreme Court's decision in Southern California Roads holding the state's prevailing wage law applied to a chartered *851 city's improvements to a state highway which ran through the city.[73]
Finally, as the facts of this case show, if "municipal affairs" are not viewed in terms of projects but only in terms of the chartered city's mode of contracting the payment of prevailing wages could become a thing of the past even in chartered cities, such as Long Beach, which have their own prevailing wage laws. The general prevailing wage law would be inapplicable because the law would implicate the city's mode of contracting which is firmly established as a "municipal affair."[74] Long Beach could avoid its own prevailing wage law anytime it wanted to by simply "contributing" public funds to a private party such as the SPCA-LA and letting it do the contracting for the project.[75]
Having determined the public projects of a chartered city are only exempt from the state's prevailing wage law if the projects in question are within the realm of the city's "municipal affairs" we turn to the question whether the facility at issue in the present case is such a project.
We conclude it is not.
As discussed in the statement of facts above, the project at issue is a facility to be shared by the City and the SPCA-LA. It will house the City's animal control department including kennels, offices and related facilities as well as a shelter operated by the SPCA-LA for the care of abandoned and injured animals along with offices and related facilities. The SPCA-LA will occupy the majority of the six acre site. The City contributed $1.5 million to the construction of the facility, approximately 15 percent of the total estimated cost. This money was placed in a segregated account and restrictions were placed on its use by the City which in essence limited its use to construction-related expenses.[76] The City also leased to the SPCA-LA the land on which the facility is to be built. The City is to receive $120 a year in rent from the SPCA-LA and is to pay the SPCA-LA $60 a year for the rental of office space in the facility. The lease gives the City sufficient control over the SPCA-LA's use of the property to assure the property is used for the intended purposes described above but beyond that the City and the SPCA-LA are two tenants sharing space for complementary but separate endeavors.
The factor which in our view takes the shelter out of the realm of a strictly municipal affair is its externality. It is undisputed this shelter is part of the SPCA-LA's countywide system of animal shelters, providing services to all of the communities within the county, not just Long Beach. Indeed, according to the SPCA-LA this shelter is intended to serve the entire county of Los Angeles as well as parts of Orange County bordering on Long Beach. The City's animal control department, which is housed in the same facility, also affects the surrounding communities because *852 domesticated or feral animals separated from their home environment and not picked up by the City could easily cross into surrounding communities such as Lakewood or Los Alamitos bringing mischief and disease with them.[77]
In Simpson v. City of Los Angeles[78] the Supreme Court recognized "the licensing, impounding and disposition of dogs is not exclusively a municipal affair[.]"[79] Although Simpson was not construing the home rule provision of Article XI, section 5, we believe its conclusion is applicable to this case. Clearly animals do not respect human boundaries and it is just as reasonable to expect sick, injured or abandoned animals will cross city limits as it is to expect water and air pollution will do the same thing. Control of the latter is not a strictly municipal affair under Article XI, section 5[80] and neither is the former.

IV. THE STATE'S PREVAILING WAGE LAW ADDRESSES MATTERS OF STATEWIDE CONCERN AND THEREFORE APPLIES TO THE PUBLIC WORKS PROJECTS OF CHARTER CITIES.

Even if a chartered city's decision whether to pay the prevailing wage on a public work could be said to be a municipal affair the city's authority to make such-a decision must give way to the state's overriding concern all applicable public works be subject to the prevailing wage law.
California enacted its first prevailing wage law in 1931.[81] The law applied to "the State of California [and] any county, city and county, city, town, district or other political subdivision of the said state...."[82] Our Supreme Court upheld the law's constitutionality a year later in Metropolitan Water Dist. v. Whitsett.[83] However, as discussed in Part III, ante, in the companion case of City of Pasadena v. Charleville the court held the new. prevailing wage law did not apply to those hired by a chartered city "to perform labor and services in connection with its municipal affairs" whether they be city employees or private sector employees.[84] The court did not specifically address the question before us in the present case. Nevertheless it is reasonable to conclude the court did not view payment of prevailing wages on public works to be a matter of statewide concern or the court would have held Pasadena had to pay prevailing wages on the fence contract despite its finding the contract involved a strictly municipal affair.[85]
*853 In the ensuing years the court has on several occasions expressed the view "the salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws."[86] The court, however, has not revisited the question whether the payment of prevailing wages has, since 1932, become a matter of sufficient statewide concern as to require chartered cities to comply with the prevailing wage law when they contract with private sector employees to perform public works. We conclude from changes in the law and the nature of the work force over the past 70 years what may once have been strictly a municipal affair has now become a matter of statewide concern and, therefore, chartered cities must comply with the state prevailing wage law when they engage private sector employees on public works.

A. The Fact That In 1932 Payment of Prevailing Wages On Public Works Projects Was Not Considered a Matter of Statewide Concern Is Not Determinative Today.

Before explaining why we believe the payment of prevailing wages is a matter of overriding state concern, as opposed to a strictly municipal affair, we pause to consider whether the rules of stare decisis permit us to even consider the question.
It is black letter law "[u]nder the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction."[87] Thus, the decisions of the California Supreme Court "are binding upon and must be followed by all the state courts of California."[88] The City argues under the doctrine of stare decisis the question whether the prevailing wage law is a matter of statewide concern can only be reexamined by the Supreme Court. We disagree.
Respectful as we are of our Supreme Court's authority we do not believe the court's decision in City of Pasadena is controlling on the question whether the prevailing wage law today is a matter of statewide concern.
The question whether something is a matter of statewide concern is not a pure question of law such as the interpretation of a statute or the adoption of a judicial rule of practice which lower courts are undeniably bound to follow. Rather, it is largely a question of fact or at least a mixed question of fact and law; the facts being the nature of the activity and the social and economic environments in which the activity takes place and the law being the law related to the activity and the Supreme Court's framework for analyzing the question.[89]
*854 Furthermore, since City of Pasadena was decided there have been significant changes in California's constitution and the statutes relating to the prevailing wage law.[90] These changes together with more recent high court decisions justify our departure from the view expressed in City of Pasadena.
Finally, the high court itself has invited lower courts to continually reexamine the question whether an activity is a strictly municipal affair or a matter of statewide concern and to "avoid the error ... of cordoning off an entire area of governmental activity as either a `municipal affair' or one of statewide concern."[91] In Pac. Tel. & Tel. Co. v. City & County of S.F., the court observed:"[T]he constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate. What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state."[92]

B. Changes In the Law and Society Since 1932 Support Our Finding The Payment of Prevailing Wages Is a Matter of Statewide Concern.

Constitutional and statutory changes since 1932 support our finding the payment of prevailing wages in public works is now a matter of statewide concern.
It is apparent from the opinion in City of Pasadena the court wanted to steer clear of a ruling the prevailing wage law constituted a matter of statewide concern lest the law be subject to challenge as a general minimum wage law and therefore unconstitutional under Adkins v. Children's Hospital.[93] Instead, the court suggested the law was based on the constitutionally acceptable ground a state may prescribe the conditions under which it will permit public works to be performed for it or for the entities over which it has control.[94]Adkins, of course, has long since been overruled.[95] Today the California Constitution specifically provides: "[t]he Legislature *855 may provide for minimum wages [for all workers]"[96] thereby demonstrating the people of California believe the issue of wages paid to all California workers is a matter of statewide concern.
The prevailing wage law of 1931 itself lent support to the view prevailing wages were strictly a municipal affair. The 1931 statute directed cities to "ascertain the general prevailing rate of per diem wages in the locality in which the work is to be performed ...."[97] The statute further provided when a city awarded a public works contract the city limits were "the locality in which the work is performed," for purposes of determining the prevailing wage and the city's determination of the prevailing wage "shall be final."[98] Today, however, the state Director of Industrial Relations is responsible for determining prevailing wage rates using a complex system of statutory and regulatory guidelines and disputes are settled through state administrative proceedings subject to judicial review.[99] Furthermore wage rates are no longer based solely on wages paid on private construction projects within the city limits but also take into consideration wages paid "in the nearest labor market area."[100]
Another major revision to the prevailing wage law occurred in 1939 with the adoption of the Shelly-Maloney Act which integrated apprenticeship programs in the construction trades with the prevailing wage law. Under Shelly-Maloney, public works contractors may pay less than the prevailing journeyman wage to apprentices in state-approved apprenticeship programs.[101] This results in education and job opportunities for apprentices by providing a financial "carrot" for contractors to participate in state-approved apprenticeship programs.[102] At the end of 2001, there were 65,904 apprentices registered in state-approved programs, the majority of whom were apprenticed in the building and construction trades such as carpenters, electricians, iron workers, plumbers and roofers.[103] It is evident the training of skilled construction workers is a matter of statewide concern, not a purely municipal affair.
When the first prevailing wage law was enacted in 1931 the Legislature took no position on whether the payment of prevailing wages on public works projects was a matter of statewide concern or a municipal affair. Recently, however, the Legislature has declared the payment of prevailing wages on public works programs to be "a matter of statewide concern."[104] The Legislature based this declaration on two findings: "(a) Payment of the prevailing rate of per diem wages to workers employed on public works is necessary to *856 attract the most skilled workers for the project and to ensure that work of the highest quality is performed on these projects[;] (b) Public works projects should never undermine the wage base in a community and requiring that workers on public works projects be paid the prevailing rate of per diem wages ensures that the wage base is not lowered."[105] Although these legislative findings are not controlling, they "are entitled to great weight."[106] Clearly, these two main purposes of the prevailing wage lawensuring a supply of skilled workers and protecting area wage standardsrespond to statewide, concerns, not merely local interests.
The economic environment in which construction workers ply their trades has also changed considerably since 1932. When City of Pasadena was decided there was no Pasadena Freewaythere were no freeways at alland the commute from Riverside or Santa Ana to a job in Pasadena would have been out of the question.[107] Today, more efficient transportation has led to a more itinerant work force able to travel longer distances to get to a job site. This is particularly true in the construction industry where employment is temporary and transitory in nature.[108] Unlike most employers, building contractors typically do not maintain full complements of employees on their payrolls.
They hire employees to meet the demands of a particular project and discharge those employees when the project is completed. In the same year a construction worker may work for numerous employers in various localities.[109] Thus, as our Supreme Court noted in Lusardi Construction, one of the "specific goals" of the prevailing wage law is "to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas...."[110]
We are not the first California court since City of Pasadena to conclude prevailing wages for public works are a matter of statewide concern. The Fourth District, in Division of Lab. Stds. Enforcement v. Ericsson Information Systems, Inc., reached the same conclusion albeit in dictum.[111] The court concluded prevailing wages were a matter of statewide concern because it found the purposes of the prevailing wage law "include protecting employees from substandard earnings if contractors could recruit labor from distant cheap-labor areas; allowing union contractors to compete with nonunion contractors for public works; the benefit to the state of superior efficiency arising from well-paid labor; and the need to compensate nonpublic employees with higher wages since they do not have the steady employment and fringe benefits *857 that public employees enjoy." Significantly, our Supreme Court adopted this same description of the purposes of the prevailing wage law in Lusardi Construction, using virtually identical language.[112]
Courts in other jurisdictions have also concluded the payment of prevailing wages on public works projects is a matter of statewide concern.
In State v. Jaastad the Arizona Supreme Court held the state's prevailing wage law for public works was "in the highest degree one of general public concern, and not merely of local or municipal interest[.]"[113] The court reasoned that unlike material products a city might purchase for the construction of a public work, "human labor ... is something higher and different, and it therefore follows that the workers are not to be considered as mere machines to be run at high speed with the least possible expense, and then scrapped as their usefulness is exhausted, but are an integral and vital part of society itself, and society must, for its own sake, if not for theirs, see that they are given protection which they cannot unaided secure for themselves."[114]
In City of Joplin v. Industrial Commission of Missouri, the Missouri Supreme Court agreed with the decision in State v. Jaastad and further noted the fact the state's prevailing wage law applied to the works of any public body, not cities only, "indicates more than mere local interest."[115]
In State ex rel. Evans v. Moore, the issue was whether a city could lawfully adopt an ordinance exempting itself from the state's prevailing wage law. The Ohio Supreme Court held: "[T]he General Assembly, in enacting the prevailing wage law, manifested a statewide concern for the integrity of the collective bargaining process in the building and construction trades. Thus, the prevailing wage law preempts and supercedes any local ordinance to the contrary."[116] The court stated three reasons for concluding prevailing wages were a matter of statewide concern: Prevailing wage rates were based on wages paid in the county, not the city.[117] The prevailing wage law delineated civil and criminal sanctions for its violation.[118] And, "[a]bove all else, the primary purpose of the prevailing wage law is to support the integrity of the collective bargaining process by preventing the undercutting of employee wages in the private construction sector."[119]
*858 In People ex tel. Bernardi v. Highland Park the Illinois Supreme Court also cited the need for uniform wage and labor laws as the reason for holding the state's prevailing wage law applied to chartered cities: "The prevailing wage law ... both mitigates against an impoverished work force and `support[s] the integrity of the collective bargaining process by preventing the undercutting of employee wages in the private construction sector.' Establishing minimum requirements to attain those goals and to otherwise improve working conditions has traditionally been a matter of State concern, outside the power of local officials to contradict, and it remains so today."[120]

C. Summary.

In summary, we have concluded the doctrine of stare decisis does not prevent us from examining the question whether in the 21st century the state prevailing wage law should apply to chartered cities' contracts for public works. As our Supreme Court has recognized "the constitutional concept of municipal affairs is not a fixed or static quantity" but one which "changes with the changing conditions upon which it is to operate."[121] We find nothing in law or logic which persuades us only our Supreme Court can decide when such conditions have changed. On the contrary, the court has held whether a particular subject matter "is of municipal or statewide concern" is a question "for the courts to decide under the facts of each case."[122]
The facts in this case convince us conditions have changed since 1932 when the Supreme Court rendered its opinion in City of Pasadena. The California Constitution now provides a minimum wage for all workers, not just women and children. Prevailing wage rates are determined by the Director of Industrial Relations under a complex system of statutory and regulatory guidelines and are subject to administrative and judicial review rather than being set by the individual cities whose decisions were final. Beginning in 1939 the Legislature adopted a scheme for promoting apprenticeship programs in the construction trades which depends for its success on the prevailing wage law. The Legislature has prefaced recent amendments to the prevailing wage law with a finding the payment of prevailing wages on public works projects is a matter of statewide concern. Today's transportation system has resulted in a more itinerant work force especially in the construction industry where employment is temporary and transitory in nature. The high courts of other states have recognized prevailing wage laws accomplish the statewide purpose of protecting the collective *859 bargaining process and protecting workers from substandard wages.
For all of these reasons we hold California's prevailing wage law is a matter of statewide concern and therefore applies to chartered cities contracting for public works regardless of whether the project itself is strictly a municipal affair.

V. THE DIR IS NOT BARRED BY THE DOCTRINES OF ESTOPPEL OR LACHES FROM MAKING A COVERAGE DETERMINATION IN THIS CASE.

The City contends the DIR is estopped from determining the project is subject to the state prevailing wage law because the department had made an earlier determination the prevailing wage law did not apply to Long Beach due to its status as a charter city. The City claims it detrimentally relied on this determination. In addition, the City contends the DIR unreasonably delayed its coverage determination.
Four elements must be present for the doctrine of estoppel to apply. "First, the party to be estopped must have been aware of the facts. Second, that party must either intend that its act or omission be acted upon, or must so act that the party asserting estoppel has a right to believe it was intended. Third, the party asserting estoppel must be unaware of the true facts. Fourth, the party asserting estoppel must rely on the other party's conduct, to its detriment."[123] At least three of the four elements are missing here.
In the coverage decision the City refers to, the DIR ruled a shopping mall built on the City's property was not a "public project" for purposes of the state prevailing law merely because the City agreed to reduce the base rent if the developer's cost of demolishing existing structures on the property exceeded $2 million. The ruling went on to note general state laws do not apply to charter cities when those cities are dealing with "`purely municipal affairs' " citing the decisions in City of Pasadena and Vial, discussed above. Contrary to the City's contention, the DIR did not rule the state prevailing wage law is inapplicable to Long Beach because it is a charter city. Rather, the DIR ruled the project at issue was not a "public work" but even if it was the public work was a "purely municipal affair."
Furthermore, the City has cited no evidence in the record showing it detrimentally relied on the shopping center ruling, which it concedes was not published as a precedential decision.
Even if the elements of equitable estoppel were present, the doctrine would not be applicable to this case. In Lusardi Construction the Supreme Court stated: "[E]stoppel will not be applied against the government if to do so would nullify a strong rule of public policy adopted for the benefit of the public."[124] As discussed above, courts have found the overall purpose of the prevailing wage law is to protect and benefit the workers and the public.[125]
The laches defense is also inapplicable to the present case. The dispute before us is a coverage dispute, not an enforcement *860 dispute. Should the Division of Labor Standards and Enforcement bring an action against the City to enforce the prevailing wage law with respect to the shelter project,[126] the City could seek to assert laches as defenses to that action.

DISPOSITION
The judgment is reversed. Appellant is awarded its costs on appeal.
We concur: PERLUSS, P.J., and MUNOZ (AURELIO), J.[*]
NOTES
[1] Future unlabeled statutory references are to the Labor Code.
[2] Section 1771 states in relevant part: "[N]to less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed .. . shall be paid to all workers employed on public works." In determining these rates the Director of Industrial Relations is required to ascertain and consider "the applicable wage rates established by collective bargaining agreements .. . within the locality and in the nearest labor market area." (§ 1773.)
[3] McIntosh v. Aubry (1993) 14 Cal.App.4th 1576, 1583, 18 Cal.Rptr.2d 680.
[4] McIntosh v. Aubry, supra, 14 Cal.App.4th at 1584, 18 Cal.Rptr.2d 680.
[5] Lusardi Construction Co. v. Aubry (1992) 1 Cal.4th 976, 985, 4 Cal.Rptr.2d 837, 824 P.2d 643 (hereafter Lusardi Construction; O.G. Sansone Co. v. Department of Transportation (1976) 55 Cal.App.3d 434, 458, 127 Cal.Rptr. 799.
[6] McIntosh v. Aubry, supra, 14 Cal.App.4th at page 1589, 18 Cal.Rptr.2d 680.
[7] Unless otherwise specified references to section 1720 are to the statute as it read at the time of the agreement between the City and the SPCA-LA. (Stats. 1989, ch. 278, § 1.)
[8] American Heritage Dictionary, Second College Edition (1982) page 315; italics added.
[9] Priest v. Housing Authority (1969) 275 Cal. App.2d 751, 756, 80 Cal.Rptr. 145.
[10] See e.g., California Code of Regulations, Title 8, section 16001, subdivision (c) which states "[f]ield survey work traditionally covered by collective bargaining agreements is subject to prevailing wage rates when it is integral to the specific public works project in the design, preconstruction, or construction phase."
[11] 70 Ops.Cal.Atty.Gen. 92, 94 (1987); citation omitted.
[12] People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 309, 58 Cal.Rptr.2d 855, 926 P.2d 1042.
[13] 70 Ops.Cal.Atty.Gen., supra, at pages 93-94.
[14] Stats.2000, chapter 881, section 1.
[15] Assem. Com. on Labor and Employment, Rep. on Sen. Bill No. 1999 (1999-2000 Reg. Sess.) as amended August 18, 2000, page 3.
[16] 40 U.S.C. sections 276a-276d-3.
[17] 29 C.F.R. section 5.2, subdivision (j).
[18] 29 C.F.R. section 5.2, subdivision (m).
[19] Southern Cal. Lab. Management Etc. Committee v. Aubry (1997) 54 Cal.App.4th 873, 882, 63 Cal.Rptr.2d 106.
[20] See Southern Cal. Lab. Management Etc. Committee v. Aubry, supra, 54 Cal.App.4th at page 883, 63 Cal.Rptr.2d 106.
[21] Lusardi Construction, supra, 1 Cal.4th at page 985, 4 Cal.Rptr.2d 837, 824 P.2d 643; O.G. Sansone Co. v. Department of Transportation, supra, 55 Cal.App.3d at page 458, 127 Cal.Rptr. 799.
[22] Section 1720, subdivision (a). The City maintains this criterion is not met when the public funds are a gift or donation to a charity such as the SPCA-LA. Be that as it may, the funds the City contributed to the shelter project cannot be characterized as a "gift" in light of the numerous strings and conditions the City placed on the SPCA-LA's use of the money and the City's promise to hold the SPCA-LA harmless from wage claims arising from the construction of the facility. (See discussion, ante, pages 840-841.)
[23] 83 Ops.Cal.Atty.Gen. 231, 231-232 (2000), citing Bishop v. City of San Jose (1969) 1 Cal.3d 56, 63-64, 81 Cal.Rptr. 465, 460 P.2d 137 [prevailing wage law does not apply to government employees].
[24] California Code of Regulations, Title 8, section 16000.
[25] We can quickly dispose of this argument. Under section 1721 a city is a political subdivision for purposes of the prevailing wage law.
[26] See Goleta Amtrack Station (1998) PW Dec. No. 98-005, page 5 and decisions cited therein.
[27] Lusardi Construction, supra, 1 Cal.4th at pages 981, 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[28] Lusardi Construction, supra, 1 Cal.4th at page 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[29] Aubry v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 967, 9 Cal.Rptr.2d 92, 831 P.2d 317.
[30] Lusardi Construction, supra, 1 Cal.4th at page 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[31] Lusardi Construction, supra, 1 Cal.4th at page 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[32] Lusardi Construction, supra, 1 Cal.4th at pages 987-988, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[33] Lusardi Construction, supra, 1 Cal.4th at page 988, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[34] See Southern California Roads Co. v. McGuire (1934) 2 Cal.2d 115, 124, 39 P.2d 412 (hereafter Southern California Roads ).
[35] Section 5, subdivision (a) states in relevant part: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."
[36] California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 17, 283 Cal.Rptr. 569, 812 P.2d 916; hereafter CalFed.
[37] City of Santa Clara v. Von Raesfeld (1970) 3 Cal.3d 239, 247, 90 Cal.Rptr. 8, 474 P.2d 976; hereafter City of Santa Clara.
[38] Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 505, 247 Cal. Rptr. 362, 754 P.2d 708.
[39] Socialist Party v. Uhl (1909) 155 Cal. 776, 788, 103 P. 181.
[40] Southern California Roads, supra, 2 Cal.2d at page 122, 39 P.2d 412.
[41] See Ex Parte Braun (1903) 141 Cal. 204, 214, 74 P. 780 (McFarland, J., Cone.) [the meaning of the term "municipal affairs" is "almost impossible" to determine].
[42] Butterworth v. Boyd (1938) 12 Cal.2d 140, 147, 82 P.2d 434.
[43] CalFed., supra, 54 Cal.3d at page 16, 283 Cal.Rptr. 569, 812 P.2d 916, citations and internal quotation marks omitted.
[44] CalFed., supra, 54 Cal.3d at page 16, 283 Cal.Rptr. 569, 812 P.2d 916; Southern California Roads, supra, 2 Cal.2d at pages 120-122, 39 P.2d 412.
[45] CalFed., supra, 54 Cal.3d at page 16, 283 Cal.Rptr. 569, 812 P.2d 916.
[46] California Constitution, article XI, section 5; CalFed, supra, 54 Cal.3d at page 13, 283 Cal.Rptr. 569, 812 P.2d 916.
[47] Johnson v. Bradley (1992) 4 Cal.4th 389, 399, 14 Cal.Rptr.2d 470, 841 P.2d 990.
[48] Johnson v. Bradley, supra, 4 Cal.4th at page 399, 14 Cal.Rptr.2d 470, 841 P.2d 990; internal quotation marks and footnote omitted.
[49] CalFed., supra, 54 Cal.3d at page 17, 283 Cal.Rptr. 569, 812 P.2d 916.
[50] CalFed., supra, 54 Cal.3d at page 17, 283 Cal.Rptr. 569, 812 P.2d 916.
[51] CalFed., supra, 54 Cal.3d a page 17, 283 Cal.Rptr. 569, 812 P.2d 916; internal quotation marks and citation omitted.
[52] CalFed., supra, 54 Cal.3d at page 24, 283 Cal.Rptr. 569, 812 P.2d 916.
[53] Johnson v. Bradley, supra, 4 Cal.4th at page 399, footnote 9, 14 Cal.Rptr.2d 470, 841 P.2d 990.
[54] Among the differences is the method for determining the applicable wage rate. State law requires wage rates to be determined from a host of factors including "collective bargaining agreements ... within the locality (e.g. the city) and in the nearest labor market area." (Lab.Code § 1773; and see Lab.Code § 1773.1 and 8 Cal. Admin. Code, tit. 8, § 16000.) Long Beach Ordinance 2.87.100, in contrast, merely directs the city council to "ascertain and determine the prevailing rate of ... wages in the city...."
[55] Associated Builders & Contractors, Inc. v. San Francisco Airports Com. (1999) 21 Cal.4th 352, 364, 87 Cal.Rptr.2d 654, 981 P.2d 499; hereafter Associated Builders.
[56] Smith v. City of Riverside (1973) 34 Cal. App.3d 529, 110 Cal.Rptr. 67.
[57] Piledrivers' Local Union v. City of Santa Monica (1984) 151 Cal.App.3d 509, 198 Cal. Rptr. 731.
[58] In Smith v. City of Riverside the court held even if the distribution of electricity and water were matters of statewide concern, "[t]he municipal activity at issue is not the distribution of electricity and water but the mode chosen to build and extend the distribution facilities." (34 Cal.App.3d at p. 536, 110 Cal. Rptr. 67.) In Piledrivers' Local Union v. City of Santa Monica, the court held even if the operation of the city's pier was a matter of statewide interest, "this interest does not arise to a preemption of nonconflicting local regulation of contract letting." (151 Cal.App.3d at p. 512, 198 Cal.Rptr. 731.)
[59] City of Pasadena v. Charleville (1932) 215 Cal. 384, 10 P.2d 745; hereafter City of Pasadena.
[60] City of Pasadena, supra, 215 Cal. at page 387, 10 P.2d 745.
[61] City of Pasadena, supra, 215 Cal. at pages 389, 392, 10 P.2d 745.
[62] Southern California Roads, supra, 2 Cal.2d at page 120, 39 P.2d 412.
[63] Southern California Roads, supra, 2 Cal.2d at page 121, 39 P.2d 412.
[64] Southern California Roads, supra, 2 Cal.2d at pages 121-122, 39 P.2d 412.
[65] City of Santa Clara, supra, 3 Cal.3d at page 247, 90 Cal.Rptr. 8, 474 P.2d 976.
[66] Vial v. City of San Diego (1981) 122 Cal. App.3d 346, 175 Cal.Rptr. 647; hereafter Vial.
[67] Vial, supra, 122 Cal.App.3d at page 347, 175 Cal.Rptr. 647.
[68] Vial, supra, 122 Cal.App.3d at page 348, 175 Cal.Rptr. 647, citing City of Pasadena, supra, 215 Cal. at page 392, 10 P.2d 745. In its respondent's brief the City quotes a portion of this same sentence from Vial as authority for the proposition the state prevailing wage law does not apply to a chartered city. The City's quote leaves out the important qualification in the italicized portion of the sentence.
[69] See discussion, ante, at page 848.
[70] Vial, supra, 122 Cal.App.3d at page 348, 175 Cal.Rptr. 647.
[71] See Note, Land-Use Control, Externalities, and the Municipal Affairs Doctrine: A Border Conflict, (1975) 8 Loy. L.A. L.Rev. 432, 442.
[72] City of Santa Clara, supra, 3 Cal.3d at page 246, 90 Cal.Rptr. 8, 474 P.2d 976; citation and internal quotation marks omitted.
[73] Southern California Roads, supra, 2 Cal.2d at pages 121-122, 39 P.2d 412.
[74] See Associated Builders, supra, 21 Cal.4th at page 364, 87 Cal.Rptr.2d 654, 981 P.2d 499 and cases cited therein.
[75] In contrast to the state prevailing wage law, the duty to pay the prevailing wage under the Long Beach prevailing wage ordinance is contractual. Long Beach does not have an ordinance equivalent to section 1771 quoted above. (Ante, page 845-846.) Instead, the Long Beach Municipal Code directs the city council to adopt, from time to time, a resolution establishing a prevailing wage and directs the city manager to provide in "any contract for public work . . . that the contractor must comply with the general prevailing rate ... as set forth in the aforesaid resolution or amendment thereto ..." Long Beach Municipal Code, sections 2.87.100, 2.87.130.
[76] See ante, page 841.
[77] Surely when it comes to the metropolitan Los Angeles area no city is an island, entire of itself. (See County of Riverside v. Superior Court (2003) 30 Cal.4th 278, 296, 132 Cal. Rptr.2d 713, 66 P.3d 718.)
[78] Simpson v. City of Los Angeles (1953) 40 Cal.2d 271, 253 P.2d 464.
[79] Simpson v. City of Los Angeles, supra, 40 Cal.2d at page 278, 253 P.2d 464.
[80] City of Santa Clara, supra, 3 Cal.3d at page 246, 90 Cal.Rptr. 8,474 P.2d 976.
[81] This uncodified legislation was known as the Public Works Wage Rate Act of 1931 (Stats. 1931, ch. 397).
[82] Statutes 1931, chapter 397, section 1.
[83] Metropolitan Water Dist. v. Whitsett (1932) 215 Cal. 400, 406-420, 10 P.2d 751.'
[84] City of Pasadena, supra, 215 Cal. at page 389, 10 P.2d 745 citing Storke v. City of Santa Barbara (1925) 76 Cal.App. 40, 244 P. 158 [private appraiser] and Jackson v. Wilde (1921) 52 Cal.App. 259, 198 P. 822 [city firefighter].
[85] This is clear from the second part of the court's opinion which held the state law prohibiting the employment of aliens on any city public work applied to Pasadena even though Pasadena was a chartered city and the public work at issue was strictly a municipal affair. City of Pasadena, supra, 215 Cal. at pages 395, 398, 10 P.2d 745. The court later overruled this holding in Purdy & Fitzpatrick v. State of California (1969) 71 Cal.2d 566, 585-586, 79 Cal.Rptr. 77, 456 P.2d 645.
[86] Sonoma County Organization of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296, 317, 152 Cal.Rptr. 903, 591 P.2d 1; and cases cited therein. The court has reached the same conclusion with respect to certain employees of the state university system. San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785, 790, 163 Cal.Rptr. 460, 608 P.2d 277. Chartered cities now have explicit authority to set compensation for their employees under article XI, section 5, subdivision (b) of the California Constitution. Nothing in our opinion affects a city's ability to set the level of wages for its own employees.
[87] Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937
[88] Auto Equity Sales, Inc. v. Superior Court, supra, 57 Cal.2d at page 455, 20 Cal.Rptr. 321, 369 P.2d 937.
[89] In Professional Fire Fighters, Inc. v. City of Los Angeles (1963) 60 Cal.2d 276, 294, 32 Cal.Rptr. 830, 384 P.2d 158, the court stated: "Because the various sections of article XI fail to define municipal affairs, it becomes necessary for the courts to decide, under the facts of each case, whether the subject matter under discussion is of municipal or statewide concern." (Italics added.) See also, Pac. Tel. & Tel. Co. v. City & County of S.F. (1959) 51 Cal.2d 766, 774, 336 P.2d 514 ("Applying the above stated rules of law to the facts of the present case, it is apparent ... the city cannot today exclude telephone lines from the streets upon the theory that `it is a municipal affair.'"); Los Angeles Ry. Corp. v. Los Angeles (1940) 16 Cal.2d 779, 787, 108 P.2d 430 (facts supported trial court's conclusion regulation of intercity rail system was not a municipal affair of defendant city); CalFed., supra, 54 Cal.3d at pages 16-18, 283 Cal.Rptr. 569, 8,12 P.2d 916 (setting forth framework for analyzing conflict between "municipal affair" and "statewide concern.)"
[90] See e.g., Lane & Pyron, Inc. v. Gibbs (1968) 266 Cal.App.2d 61, 66, 71 Cal.Rptr. 817; Budde v. Superior Court (1950) 97 Cal. App.2d 615, 621-622, 218 P.2d 103 (declining to follow earlier Supreme Court decisions in light of subsequent statutory amendments).
[91] CalFed., supra, 54 Cal.3d at page 17, 283 Cal.Rptr. 569, 812 P.2d 916.
[92] Pac. Tel. & Tel. Co. v. City & County of S.F., supra, 51 Cal.2d at page 771, 336 P.2d 514.
[93] Adkins v. Children's Hospital (1923) 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785. See City of Pasadena, supra, 215 Cal. at page 390, 10 P.2d 745.
[94] Atkin v. Kansas (1903) 191 U.S. 207, 24 S.Ct. 124, 48.L.Ed. 148. See City of Pasadena, supra, 215 Cal. at page 390, 10 P.2d 745.
[95] West Coast Hotel Co. v. Parrish (1937) 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703.
[96] California Constitution, article XIV, section 1.
[97] Public Works Wage Rate Act, supra, section 2.
[98] Public Works Wage Rate Act, supra, section 4.
[99] Labor Code sections 1770-1773.4; California Administrative Code, title 8, section 16000; Independent Roofing Contractors v. Department of Industrial Relations (1994) 23 Cal.App.4th 345, 351, 28 Cal.Rptr.2d 550.
[100] Section 1773.
[101] Labor Code section 1777.5, subdivision (b).
[102] California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc. (1997) 519 U.S. 316, 332, 117 S.Ct. 832, 136 L.Ed.2d 791.
[103] California Division of Apprenticeship Standards, 2001 Legislative Report, Ex. 5.
[104] Stats.2002, chapter 892, section 1; Stats 2002, chapter 868, section 1.
[105] Stats.2002, chapter 892, section 1; Stats 2002, chapter 868, section 1.
[106] County of Riverside v. Superior Court, supra, 30 Cal.4th at page 286, 132 Cal.Rptr.2d 713, 66 P.3d 718.
[107] The Pasadena Freeway, California's first, was built in the 1940's.
[108] Note, The Retroactive Application of Deklewa: Inequitable and Unjust Results For Construction Industry Employers (1991) 8 Hofstra Lab. L.J. 417, 491, footnote 29.
[109] See NLRB v. Iron Workers (1978) 434 U.S. 335, 348-349, 98 S.Ct. 651, 54 L.Ed.2d 586.
[110] Lusardi Construction, supra, 1 Cal. 4th at page 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[111] Division of Lab. Stds. Enforcement v. Ericsson Information Systems, Inc. (1990) 221 Cal.App.3d 114, 123, 270 Cal.Rptr. 75. The court's opinion on this issue was dictum because the defendant and the University of California entered into a contract which specifically called for the payment of prevailing wages. (Id. at pp. 120, 124, 270 Cal.Rptr. 75.)
[112] Lusardi Construction, supra, 1 Cal.4th at page 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[113] State v. Jaastad (1934) 43 Ariz. 458, 32 P.2d 799, 801.
[114] State v. Jaastad, supra, 32 P.2d at page 801. The court declined to follow City of Pasadena, stating the opinion in that case looked at the question from the standpoint of the physical result to be achieved by the project instead of the statewide objective of the prevailing wage law. (Ibid.)
[115] City of Joplin v. Industrial Commission of Missouri (Mo. 1959) 329 S.W.2d 687, 693-694.
[116] State ex rel. Evans v. Moore (1982) 69 Ohio St.2d 88, 23 O.O.3d 145, 431 N.E.2d 311, 313.
[117] Compare sections 1724, 1773, California Administrative Code, title 8, section 16000 [prevailing wages for a city's public work are determined based on wage rates in city and nearest labor market area].
[118] Compare sections 1775 and 1777 prescribing civil and criminal penalties for violation of California's prevailing wage law.
[119] State ex rel. Evans v. Moore, supra, 431 N.E.2d at page 313. Cf. Lusardi Construction, supra, 1 Cal.4th at page 987, 4 Cal. Rptr.2d 837, 824 P.2d 643.
[120] People ex rel. Bernardi v. Highland Park (1988) 121 Ill.2d 1, 117 Ill.Dec. 155, 520 N.E.2d 316, 322, citation omitted. Cf. section 90.5, subdivision (a) which declares it is the public policy of the State of California "to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards." Our Supreme Court has held the prevailing wage law is part of the public policy expressed in section 90.5 because its "overall purpose ... is to protect and benefit employees on public works projects." Lusardi Construction, supra, 1 Cal.4th at page 985, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[121] Pac. Tel. & Tel. Co. v. City & County of S.F., supra, 51 Cal.2d at page 771, 336 P.2d 514.
[122] Professional Fire Fighters, Inc. v. City of Los Angeles, supra, 60 Cal.2d at page 294, 32 Cal.Rptr. 830, 384 P.2d 158.
[123] Lusardi Construction, supra, 1 Cal.4th at page. 994, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[124] Lusardi Construction, supra, 1 Cal.4th at pages 994-995, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[125] Lusardi Construction, supra, 1 Cal.4th at page 985, 4 Cal.Rptr.2d 837, 824 P.2d 643.
[126] See section 1775.
[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.